IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 11, 2005 Session

## CATHY GURLEY, ET AL. v. MATT KING, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 01-1585-III     Ellen Hobbs Lyle, Chancellor**

_____

**No. M2003-02897-COA-R3-CV - Filed August 18, 2005**

_____

This is a breach of contract action wherein the trial court granted summary judgment to Defendant on the grounds that the contract was too uncertain and indefinite to be enforced. The action of the trial court is reversed, and the case remanded for trial on its merits.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J, joined.

D'Lesli Davis, Nashville, Tennessee, for the appellants, Cathy Gurley and Gurley & Company, Inc..

Katherine R. Cloud, William D. Martin, Nashville, Tennessee, for the appellees, Matt King and King of the Hill, Inc.

**OPINION**

I.  FACTUAL BACKGROUND

Defendant, Matt King ("King"), is a Nashville performing artist and songwriter. In House, Inc. ("In House") is an artist management company with Gary Morris being the principal owner of stock in the corporation. On December 4, 1995, King entered into a management agreement with In House for a two-year period. This Agreement provided that In House would have options to renew the Agreement for two additional one-year periods. The Agreement further provided that King would pay to In House 15% of his gross monthly earnings during the contract term and 10% of all monies received from the exploitation of any product created by King during the term of the Agreement and received following the termination of the Agreement.

Plaintiff, Gurley & Company, Inc. is a corporation also engaged in the business of musical artist management. Plaintiff, Cathy Gurley ("Gurley") is principal and stock holder of Gurley & Company. On October 14, 1997, In House contracted with Gurley to assist in the management of

King, with Gurley to have day-to-day personal contact with King because King and Morris were having personality conflicts. The relationship between King and Morris continued to deteriorate, and King informed Gurley that if she could get him out of the In House Agreement, King and Gurley could then work together. In March of 1999, King and Gurley agreed that, following the expiration of the In House Agreement, Gurley would act as exclusive manager for King for a period of three years and receive a 15% commission from his gross income. On March 20, 1999, Gurley and King signed a memorandum of their agreement (the "King/Gurley Contract") providing:

> This letter will serve to state that I will sign an exclusive management agreement with Cathy Gurley for a period of three years. This will begin either when my agreement with In House ends (December 1999) or earlier if Cathy is able to persuade In-House to relinquish their contract. Gary Morris had indicated to Cathy that this might be a possibility, since Gary has relinquished the management responsibilities to Cathy for the past year.

> The details of the agreement will be worked out later but will basically follow the same arrangement currently in place with In House.

In House had exercised each of its two one-year options, and the King/In House Agreement was set to expire December 4, 1999. Gurley continued to act as day-to-day manager for King until December 1, 1999, when King, at a pre-arranged meeting, suggested that they "part ways." On December 6, 1999, Gurley wrote to King:

> As promised here is the letter, to reconfirm our conversation of December 1, 1999. I understand it is your intention to no longer utilize my services or Gurley & Co. as your representative for your music career. I will no longer attempt any negotiations regarding publishing and/or recording contracts or projects, etc.

> Not withstanding your current wishes, you acknowledge that we have performed services for the past year for which we have received no compensation. Additionally, you have a signed agreement with us which runs until December 1, 2002. You have agreed that when other arrangements are made in regards to management, recording or publishing, etc., we will meet to assign an appropriate buy-out amount, both for past services and for those which would have been maintained in the future.

King did not respond to the December 6, 1999, letter, and on May 18, 2001, Gurley filed suit against King for damages and declaratory relief relative to breach of the alleged March 20, 1999, King/Gurley Contract, breach of the alleged oral agreement between the parties and recovery in *quantum servuit* for value of services rendered. King answered denying that any valid and enforceable contract existed between Gurley and King.

Following discovery, King moved for summary judgment as to the alleged King/Gurley Contract on the basis that the purported Contract, at best, constituted only "an agreement to agree"

and was not enforceable because essential elements were never agreed to and the alleged arrangements between the parties were too indefinite and uncertain to be enforceable. The trial court first overruled this Motion for Summary Judgment, but, shortly before trial by jury was to begin and while considering certain motions in limine filed by King, reversed itself as to the issue of uncertainty and enforceability of the alleged Contract and dismissed the Complaint for breach of contract on such grounds. Gurley then voluntarily dismissed their claim for *quantum servuit* and timely appealed the breach of contract ruling.

The first issue on appeal by Gurley is decisive. This issue poses the question:

> Did the trial court err in ruling that the King/Gurley agreement was too indefinite and uncertain to be enforceable, and therefore, in dismissing the Gurley parties' breach of contract claim against the King parties?

## II. STANDARD OF REVIEW

Since it is clear in this case that, in dismissing Gurley's breach of contract claim *sua sponte* two days before the scheduled jury trial, the trial court simply revisited its previous denial of King's Motion for Summary Judgment on this ground, we will review the action of the trial court under the familiar standards governing a grant of summary judgment. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993).

Applying summary judgment principles, the trial court erred in dismissing the Complaint on the basis that the King/Gurley Contract was too indefinite and uncertain to be enforceable. As the Court of Appeals of Massachusetts held in a similar context:

> The question before us is not whether the parties to the letter of intent were, in a commercial sense, "merely hugging or engaged to be married," *Schwanbeck v. Federal-Mogul Corp.*, 31 Mass.App.Ct. 390, 394, 578 N.E.2d 789 (1991), *S.C.*, 412 Mass. 703, 592 N.E.2d 1289 (1992), but rather if there is a genuine issue whether the letter incorporates in a binding manner all the essential terms of the contemplated transaction. The submissions under Mass.R.Civ.P. 56, 365 Mass. 824 (1974), viewed contextually, and with an indulgence in Hunneman's favor, see *Conley v. Massachusetts Bay Transp. Authy.*, 405 Mass. 168, 173, 539 N.E.2d 1024 (1989), demonstrate that such an issue exists.

*Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 765 N.E.2d 800, 807 (Mass.App.Ct.2002).

## III. LAW

### A. Does a Contract Exist?

Destruction of contracts because of uncertainty has never been favored by the law, and with the passage of time, such disfavor has only intensified. This Court has held:

> The Appellant argues in its brief that several important provisions were omitted from the letter of intent, including such matters as the store hours, the tax and insurance responsibility, and the contract duration. On the basis of such omissions, the Appellant would have us declare the letter of intent to be so indefinite as to be unenforceable.
>
> "The determination that an agreement is sufficiently definite is favored. Therefore, the courts will, if possible so construe the agreement as to carry into effect the reasonable intention of the parties, if that can be ascertained. The law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed his part of the contract." 17 Am.Jur.2d *Contracts* § 75 (1964).

*APCO Amusement Co. v. Wilkins Family Rest. of Am., Inc.*, 673 S.W.2d 523, 528 (Tenn.Ct.App. 1984); *see also McClain v. Kimbro Constr. Co., Inc.*, 806 S.W.2d 194, 198 (Tenn.Ct.App.1990).

As observed by the Supreme Court of Oregon:

[I]n suits for specific performance, as in other cases:

> "The law does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." (*quoting* 11 Williston on Contracts 813, § 1424 (3d ed. 1968)).

*Accord* 5A Corbin on Contracts 279-83, § 1174 (1964):

> "Courts should be ready to give those reasonable interpretations that ordinary businessmen are willing to give, seeking the aid of experts and giving heed to all the surrounding circumstances. * * * The fact that the parties omitted certain provisions that are commonly included may indicate an intention to be bound without them and the gaps may be provided for in the decree.
> " * * *.
>
> " * * * Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact."

*See also* Restatement of Contracts § 370 (1932).

Essentially, then, the resulting standard becomes one of substantial fairness to both parties. Neither party to a contract should be required to perform additional, material terms to which he did not either explicitly or implicitly agree. On the other hand, however, neither party should be allowed to avoid his contractual duties merely because the language which was utilized to express the agreement is less specific and complete than that which a careful lawyer would ordinarily employ.

*Van v. Fox*, 564 P.2d 695, 699 (Or.1977).

In addressing an assertion by the defendant that an alleged agreement was not sufficiently certain to constitute an enforceable contract, the Court of Appeals of Ohio held:

The modern view of contractual certainty is well expressed in Restatement of the Law 2d, Contracts (1981) 92, Section 33:

"§ 33. Certainty

"(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

"(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

"(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance."

See, also, Corbin, Contracts (1963), Section 95.

Comment *a* to Section 33 of the Restatement adds:

" * * * [T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.

"An offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary. * * * Where the parties have intended to conclude a

bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract."

Comment *f* to Section 33 notes at page 95:

"The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are more likely to be left to the option of one of the parties or to what is customary or reasonable."

The legislature has adopted similar principles for sales of personalty, in the Uniform Commercial Code. R.C. 1302.07. That legislatively demonstrated public policy should apply equally here.

*Mr. Mark Corp. v. Rush, Inc.*, 464 N.E.2d 586, 589-90 (Ohio Ct.App.1983).

In reversing a trial court's grant of summary judgment because of uncertainty in the binding character of a letter of intent executed by the parties, the Court of Appeals of Texas discussed at length the governing principles of law.

To be enforceable, the parties must have agreed on essential terms. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992). However, parties may agree on some of the contractual terms, understanding them to be an agreement, and leave other contract terms to be made later. *Id.* It is only when an essential term is left open for future negotiation that there is nothing more than an unenforceable agreement to agree. *Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex.App.-San Antonio 2002, pet. denied) (citing *T.O.Stanley Boot Co.*, 847 S.W.2d at 221). A party cannot accept an offer to form a contract unless its terms are reasonably certain. *Id.* (citing *Texas Oil Co. v. Tenneco, Inc.*, 917 S.W.2d 826, 830 (Tex.App.-Houston [14th Dist.] 1994), *rev'd on other grounds sub nom., Morgan Stanley & Co., Inc. v. Texas Oil Co.*, 958 S.W.2d 178 (Tex.1997)). Texas courts favor validating transactions rather than voiding them, but courts may not create a contract where none exists and they generally may not add, alter, or eliminate essential terms. *Id.* In construing an agreement, the courts may consider evidence of circumstances surrounding its execution. *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex.App.-San Anotonio 1996, writ denied) (citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981)).

Under some circumstances, a binding contract may be formed if the parties agree on the material terms, even though they leave open other provisions for later negotiation. *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 19 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (citing *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex.1972)). Similarly, a letter of intent may be binding even though it refers to the drafting of a future, more formal agreement. *Id.* (citing

*Foreca, S.A. v. GRD Dev. Co., Inc.*, 758 S.W.2d 744, 746 (Tex.1988)). As letters of intent may be binding, authorities are quick to warn parties of the risks involved with their use. *Id.* A party not wishing to be prematurely bound by a letter agreement is advised to include a provision clearly stating that the letter is nonbinding, as such negations of liability have been held to be effective. *Id.* (quoting E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.8b, at 193 (1990)). No such provision was included here.

*Kelly v. Rio Grande Computerland Group*, 128 S.W.3d 759, 766-67 (Tex.App.2004).

In *Hunneman Real Estate v. Norwood Realty, Inc.*, 765 N.E.2d 800 (Mass. App.Ct. 2002), the trial court had granted summary judgment to the defendant, and the court of appeals posed the controlling question:

> The central issue is whether the letter of intent presented a genuine issue as to whether it bound the signatories to perform their recited obligations or whether it was, as determined by the judge, "merely an agreement to agree" and, therefore, not enforceable as matter of law. See *Rosenfeld v. United States Trust Co.*, 290 Mass. 210, 217, 195 N.E. 323 (1935) ("An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto").

*Hunneman Real Estate*, 765 N.E.2d at 803. In reversing the grant of summary judgment as to the contract question, the Court of Appeals of Massachusetts reasoned:

> The most recent pronouncements in our cases on the subject of the enforceability of precontractual agreements place great reliance on the intention of the parties. *McCarthy v. Tobin*, 429 Mass. 84, 87, 706 N.E.2d 629 (1999) ("The controlling fact is the intention of the parties"). See *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878, 724 N.E.2d 699 (2000), citing *David J.Tierney, Jr., Inc. v. T. Wellington Carpets, Inc.*, 8 Mass.App.Ct. 237, 241, 392 N.E.2d 1066 (1979), for the proposition that a "party to [a] contract may be found to have entered [a] binding agreement if [that] party intended to be presently bound." Here, the intent of the parties to be bound by the letter of intent is not left to inference from the terms of their agreement but is twice expressly stated in prominent parts of the letter of intent. Where intention is clearly stated or evident, the analytical focus generally turns to whether the inchoate or unresolved aspects of the parties' agreement are "essential" or "material." "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement. . . . It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." *Situation Mgmt. Sys. Inc. v. Malouf, Inc., supra* at 878, 724 N.E.2d 699. (Citations omitted.)

. . . .

Provision for the execution of a more formal document such as a purchase and sale agreement is not conclusive. Compare *Coan v. Holbrook*, 327 Mass. 221, 224, 97 N.E.2d 649 (1951), quoting from Restatement of Contracts § 26 (1932) ("Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . .") with *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 216, 195 N.E. 323 (1935) ("Normally the fact that parties contemplate the execution of a final written agreement justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled"). That the letter of intent looked to the parties' respective attorneys to prepare a purchase and sale agreement containing "such additional terms as are normal" to an asset purchase and which could be signed as late as the closing of the transaction, smacks more of formality and legal boilerplate than a call for further negotiation of material terms. "Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties." *Lafayette Place Assocs. V. Boston Redev. Authy.*, 427 Mass. 509, 518 n.9, 694 N.E.2d 820 (1998), quoting from *Teachers Ins. and Annuity Assn. v. Tribune Co.*, 670 F.Supp. 491, 497-498 (S.D.N.Y.1987) (Leval, J.).

*Id.*, at 804-06; *see also Arnold Palmer Golf Co. v. Fuqua Indus., Inc.*, 541 F.2d 584 (6th Cir. 1976).

The court further observes in footnote that " 'The subsequent conduct and interpretation of the parties themselves may be decisive of the question as to whether a contract has been made, even though a document was contemplated and has never been executed.' 1 Corbin § 2.9, at 154." *Hunneman Real Estate*, 765 N.E.2d at 806 n.11.

Three Tennessee cases are expositive of the general questions controlling this case. The first of these is *Engenius Entertainment, Inc. v. Herenton*, 971 S.W.2d 12 (Tenn.Ct.App.1997). In that case, a developer sued the city of Memphis, Shelby County and their respective mayors for, among others things, breach of contract. In determining that the breach of contract count of the complaint failed to state a cause of action, this Court reasoned:

In asserting its breach of contract claims, EnGenius relies on the existence of at least three documents to establish the existence of a contract: the RFP issued by the Defendants; EnGenius's response to the RFP; and letters from the Defendants informing EnGenius that it had been selected as the successful developer. The allegations of EnGenius's complaint and these documents, however, make clear that

the parties also contemplated the subsequent execution of a formal contract memorializing the parties' agreement. The *Restatement (Second) of Contracts* addresses the question of whether a contract exists at this stage in the parties' negotiations:

**§ 27.  Existence of Contract Where Written Memorial is Contemplated**

**Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.**

**Comment:**

*a*. Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

*b*. On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

*Restatement (Second) of Contracts* § 27 (1979).

As explained by another authority,
It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not

-9-

already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

1Arthur L. Corbin et al., *Corbin on Contracts* § 2.8, at 133-34 (Rev. ed. 1993) (footnotes omitted).

In accordance with the foregoing authorities, we hold that EnGenius's complaint fails to state a cause of action for breach of contract. When viewed in their entirety, the documents upon which EnGenius relies to establish the existence of a contract, as well as the allegations of EnGenius's complaint, make clear (1) that the parties intended to enter into a written contract memorializing their agreement, but (2) that the parties had not yet reached agreement on certain essential terms of the agreement. Specifically, the RFP issued by the Defendants indicated that two essential terms of the lease agreement would be negotiated after the Defendants selected a developer. Although the RFP required the developer to propose a minimum rent and percentage of gross revenues to be paid the Defendants, the RFP also provided that the specific rent structure would be negotiated between the parties upon selection of a developer. The RFP further provided that the term of the lease would be negotiable, although the term could not exceed 20 years. In the absence of agreement as to these two terms, we conclude that, as a matter of law, no agreement existed between the parties regarding EnGenius's development and lease of The Pyramid space. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 74 (2d Cir.1989) (holding that no binding contract existed where documents relied upon referred to possibility that negotiations might fail and to completion of binding sales agreement at some future date); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432-33 (7th Cir.1993) (affirming trial court's dismissal of breach of contract claim where parties' preliminary agreement specified that any final agreement was subject to preparation and execution of mutually satisfactory purchase agreement); *Viking Broad. Corp. v. Smell Publ'g Co.*, 243 Neb. 92, 497 N.W.2d 383, 386 (1993) (affirming summary judgment in favor of defendant where "letter of intent was so cursory, indefinite, and conditional as to fail as a matter of law to establish an objective intent on the part of the parties to be bound thereby"). At most, the documents evinced an agreement between the parties to negotiate in good faith to reach a final lease agreement. *See Arcadian Phosphates*, 884 F.2d at 74; *Venture Assocs. Corp.*, 987 F.2d at 433; *see also Arnold Palmer Golf Co. v. Fuqua Indus.*, 541 F.2d 584, 588-89 (6th Cir.1976); *United Magazine Co. v. Prudential Ins. Co.*, 877 F.Supp. 1076, 1083 (S.D.Ohio 1995).

*Engenius Entm't*, 971 S.W.2d at 17-18.

The second case from Tennessee is *Davidson v. Holtzman*, 47 S.W.3d 445 (Tenn.Ct.App.2000). In this case, Defendant appealed a jury verdict asserting that the two alleged oral contracts were too indefinite to be enforced. The defendant relied primarily on *Jamestowne on

*Signal, Inc. v. First Federal Savings and Loan Association*, 807 S.W.2d 559 (Tenn.Ct.App.1990), wherein this Court held that the parties' dealings were too indefinite to create an enforceable contract because essential elements of a contract were unsettled. In affirming the jury verdict in favor of Davidson, this Court held:

> We find that there is material evidence to support a finding of an oral contract by which Holtzman promised to pay Davidson five percent of the difference between the purchase price and the sales price of the Chattanooga franchise. Setting aside for the moment the issue of Feder's testimony — which we will address separately — the only evidence presented at trial regarding the parties' agreement was the testimony of the parties and their correspondence after the agreement was allegedly made. Because the parties' testimony was sharply conflicting, the jury was required to assess the credibility of the witnesses. It is apparent from the verdict that the jury was not impressed with Holtzman's version of the parties' dealings or his explanation that his responses to Davidson's correspondence were in regard to compensation owed for consultation. We are not in a position to assess witness credibility. *See Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn.1994).
>
> The correspondence between the parties also supported the jury's finding of an oral contract. In his responses to Davidson's repeated requests for payment, Holtzman acknowledges that Davidson is owed some compensation; he refers to "the issue of the 'benefits'" and states that he has "always tried to 'do the right thing' regarding financial issues." Although Holtzman introduced three memoranda at trial in which he denies the existence of any agreement, the jury was free to disregard them.

*Davidson*, 47 S.W.3d at 454.

The third case from Tennessee is the opinion of this Court in *Kandel v. Center for Urological Treatment and Research, P.C.*, No. M2000-02128-COA-R3-CV, 2002 WL 598567 (Tenn.Ct.App. April 17, 2002). This case contains an enlightening discussion of developments in the law following the landmark decision of a New York Federal District Court in *Teachers Insurance and Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987). This historic New York decision delineated two types of preliminary agreements, the first type being where parties agree to later formalize a contract about which there has been complete agreement on all of the essential issues. The second type involves a situation where parties have committed themselves to some of the major terms, but other essential elements remain to be negotiated. As explained by the New York District Court:

> Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all issues perceived to require negotiation. Such an

agreement is preliminary only in form — only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.), *cert denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. . . . Restatement (Second) of Contracts, § 26 (then Tert. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957)."

The second and different sort of preliminary and binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type — the binding preliminary commitment — does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counter-party negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract.

*Teachers Ins. and Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y. 1987).

After characterizing the *Kandel* preliminary agreement to be of the second type, the Court pretermits any further discussion of the first type and declines to commit Tennessee as to the second type with the observation that:

In this case, we need not determine whether such a preliminary agreement would be enforceable under Tennessee law. Even if Tennessee courts would recognize a cause of action based on such a provision, our review of the record

-12-

indicates that no reasonable trier of fact could find that the defendants breached their duty under the circumstances.

*Kandel*, 2002 WL 598567, at *6.

In the case at bar, we are dealing with the first type under *Teachers Ins. and Annuity Ass'n* since it is alleged that all material provisions of the Gurley/King Contract had been agreed to and the parties intended to formalize that agreement by a later writing. No "good faith" negotiation of essential elements of contract is involved.

### B. Partial Performance

Finally, a factual issue exists as to part performance by Gurley. "Part performance under an agreement may remove uncertainty and establish that a  contract enforceable as a bargain has been formed." *Restatement (Second) of Contracts* § 34(2) (1979); *see Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554 (Tex.1972); *see Somont Oil Co., Inc. v. Nutter*, 743 P.2d 1016 (Mont.1987).

In reversing a case in which the trial court had granted summary judgment because of uncertainty, the United States District Court of New Jersey held:

> The law generally and in New Jersey does not favor voiding a contract for vagueness. *See* E. Allen Farnsworth, *Contracts* § 3.27 at 208-09 (2d ed. 1990); *Paley v. Barton Savs. & Loan Ass'n*, 82 N.J.Super. 75, 83, 196 A.2d 682 (App.Div.), *certif. denied*, 41 N.J. 602, 198 A.2d 446 (1964). The courts will not scruple at filling gaps or interpreting ambiguous terms where there is evidence of a manifestation of assent to enter into a bargain. *See Paley*, 82 N.J.Super. at 83, 196 A.2d 682; *Heim v. Shore*, 56 N.J.Super. 62, 73, 151 A.2d 556 (App.Div.1959); 4 Samuel Williston, *Williston on Contracts*, § 4:18 at 421-22 (4th ed. 1990). Thus, a promise to provide "the usual sponsorship fees" for a bowling team was sufficient. *Leitner v. Braen*, 51 N.J.Super. 31, 39-40, 143 A.2d 256 (App.Div.1958). Likewise, an agreement by a savings and loan association to hold $100,000 available to buy mortgages that a real estate developer hoped to obtain from the future buyers of unbuilt houses was sufficiently definite. *Paley*, 82 N.J.Super. at 82-84, 196 A.2d 682.

> A contract may be sufficiently certain even though one party has discretion to choose between material terms. *Kleckner v. Mutual Life Ins. Co.*, 822 F.2d 1316, 1319 (3d Cir.1987). Partial performance by one side of the bargain may, by the specifics of that performance, cure an indefinite term of the agreement. *Merrick v. United States*, 846 F.2d 725, 726 (Fed.Cir.1988); *Restatement (Second) of Contracts*,§ 34(2) (1979); Joseph M. Perillo, *Corbin on Contracts*, § 4.7 at 606-08 & n. 2 (rev. ed. 1993). Likewise, even if uncertainty remains, where one party has acted in reliance on an indefinite agreement the courts will act to protect that reliance

whether through a contractual or non-contractual remedy. *Restatement, supra* § 34(3); *see also Heim*, 56 N.J.Super. At 73, 151 A.2d 556.

*Lo Bosco v. Kure Eng'g Ltd.*, 891 F.Supp. 1020, 1026 (D.N.J.1995); *see also Hanna v. Glover*, No. CA 03-939, 2004 WL 848329 (Ark.Ct.App.2004).

It is not disputed in this record that Gurley performed services for King during the management period. The dispute arises as to whether or not Gurley's performance was as an employee of In House under the In House Agreement with King or as manager for King under the alleged Gurley/King Contract of March 20, 1999. On this question, the evidence is conflicting, particularly as it relates to the testimony of Gurley and King. This factual determination involving the credibility of witnesses is for the trier of fact.

## IV. ANALYSIS

With this insight into what we consider to be the controlling law, we now turn to the merits of the appeal. We are not concerned at this point with whether or not a contract, in fact, exists between the parties, but rather with whether or not reasonable minds could differ on that question. If reasonable minds could so differ, summary judgment must be reversed and the case remanded for trial on its merits under principles laid down in *APCO Amusement*.

It is undisputed that the seven-page written management contract between King and In House expired by its terms on December 4, 1999. On March 20, 1999, Gurley and King signed a document providing:

> This letter will serve to state that I will sign an exclusive management agreement with Cathy Gurley for a period of three years. This will begin either when my agreement with In House ends (December 1999) or earlier if Cathy is able to persuade In-House to relinquish their contract. Gary Morris had indicated to Cathy that this might be a possibility, since Gary has relinquished the management responsibilities to Cathy for the past year.
>
> The details of the agreement will be worked out later, but will basically follow the same arrangement currently in place with In House.

In dismissing the breach of contract action, the trial court held that the March 20, 1999, letter was too indefinite and uncertain and that there was an absence of essential terms to form a management contract. In order to uphold this ruling of the trial court, it must appear as a matter of law that "the details of the agreement" to be worked out later were "essential terms" rather than details not essential to the formation of a contract. Clearly, the language used by the parties in the March 20, 1999, document does not establish, as a matter law, that such "details" involved "essential elements" of a contract. *See Engenius Entertainment*, 971 S.W.2d 12. Material factual questions remain which must be considered by the trier of fact under settled principles of law.

"Broadly speaking, preliminary negotiations as to terms of an agreement do not constitute a contract, although this does not preclude the formation of a binding contract during the negotiations."  17 Am.Jur.2d *Contracts* § 25 (1964).  In this regard, "[i]t is well settled that a binding contract may be entered into through the medium of correspondence by letter or telegraph." *Neilson & Kittle Canning Co. v. F.G.Lowe & Co.*, 149 Tenn. 561, 564, 260 S.W. 142 (1924).  Therefore, merely because the document signed by the parties was expressly designated to be a "letter of intent" does not preclude it from constituting a valid contract.

In determining whether or not the letter should be construed as a binding contract, we must keep in mind that

> "[t]he primary test as to the actual character of a contract is the intention of the parties, to be gathered from the whole scope and effect of the language used, and mere verbal formulas, if inconsistent with the real intention, are to be disregarded.  It does not matter by what name the parties chose to designate it.  But the existence of a contract, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined in case of doubt not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances."

> 17 Am.Jur.2d *Contracts* § 1 (1964).

This same approach, examining the conduct of the parties, was adopted by this court in the case of *Bailey v. Brister*, 49 Tenn.App. 191, 353 S.W.2d 564 (1961).  In determining whether certain correspondence, in the form of letters sent between the parties, constituted a contract or was merely a part of the negotiations leading to a potential contract, we stated that "[t]he practical interpretation of a contract by the parties thereto is entitled to great, if not controlling influence, and will be adopted by the courts."  *Id.* at 568.  The court explained this rule of interpretation, quoting from Williston on Contracts, § 623, as follows: " ' "The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only acts but the declarations of the parties may be considered." ' " *Bailey*, 353 S.W.2d at 568.  In the present case, reviewing the conduct of the parties, we believe the parties acted upon the letter in such a way as to suggest that they believed a binding agreement had been reached.

*APCO Amusement*, 673 S.W.2d at 527.

In reaching the conclusion that a genuine issue of material fact exists, we review the actions taken in the trial court, which are, procedurally, somewhat unique.  On May 19, 2003, King filed his Motion for Summary Judgment asserting that the King/Gurley agreement was unenforceable as a matter of law.  On June 23, 2003, Gurley filed their opposition to Defendants Motion for Summary

Judgment together with an Additional Statement of Undisputed Material Facts. On June 25, 2003, King responded to the Additional Statement of Undisputed Material Facts, which response, in relevant part, provided:

> 32. In March of 1999, Gurley and King agreed that Gurley would attempt to get King out of the In House Agreement. Gurley Aff.
> **RESPONSE:**
> Admit.

> 33. They also agreed that following the In House Agreement, Gurley would act as exclusive manager of King for three years and that she would receive a 15% commission on his gross income. At the time that Gurley and King orally made that agreement, Gurley believed that she would act as King's manager following the In House agreement.
> **RESPONSE:**
> Admit

> 34. The Gurley-King management agreement would begin either when Gurley got King out of the In House agreement or when it expired. Gurley Aff.
> **RESPONSE:**
> Admit

> 35. Deposition Exhibit 4 is a true and correct copy of a memorandum signed by King on March 20, 1999 ("the March 20, 1999 document"). King Dep. 43.24-44.9.
> **RESPONSE:**
> Admit

> 36. The March 20, 1999 document states:

>> "This letter will serve to state that I will sign a exclusive management agreement with Cathy Gurley for a period of three years. This will begin either when my agreement with In House ends (December 1999) or earlier if Cathy is able to persuade In House to *relinquish* their contract. Gary Morris had indicated to Cathy that this might be a possibility, since Gary has relinquished the management responsibilities to Cathy for the past year.

>> The details of the agreement will be worked out later but will basically follow the same arrangement currently in place with In House."

> Kind Deposition Exhibit 4.

**RESPONSE:**
Admit.

37. The March 20, 1999 memorandum also reflected at least partially the oral agreement Gurley and King made. Gurley Aff. King Dep. Ex. 4.
**RESPONSE:**
Admit.

38. As of March 20, 1999, King had asked Gurley to get him out of the King/In House Agreement, and there had not at the time been any confirmation that he could or would not get out of the King/In House Agreement. King Dep. 47.6-48.22.
**RESPONSE:**
Admit.

39. King signed the March 20, 1999 document, "in hopes that I could get out of my contract." King Dep. 47.6-48.22
**RESPONSE:**
Admit.

40. King "really" wanted to be out of "his contract with Gary" and was interested in a Nascar sponsorship. King Dep. 51.25-52.17.
**RESPONSE:**
Admit.

41. In fact, King understood that after signing the March 20, 1999 document, his obligation was *to sign* an exclusive management agreement with Gurley. King Dep. 54.3-54.7.
**RESPONSE:**
Admit.

42. King acknowledges that — whatever else the March 20, 1999 memorandum may represent — on March 20, 1999, *he agreed to sign a management agreement with Cathy Gurley for a three-year term.* King Dep. 44.13-44.25.

**RESPONSE:**
Admit.

43. The March 20, 1999 document, notes that "the *details* of the agreement" would be worked out later "*but will basically follow the same arrangement currently in place with In House.*" King Dep. 47.23-48.4.
**RESPONSE:**
Admit.

44. While Gurley and King agreed that a more detailed written agreement would follow, King agreed to the essential terms of: a three-year term, exclusivity and price (15%) in March, 1999. Gurley Aff.

**RESPONSE:**

Admit.

Following these submissions, the trial court on July 14, 2003, entered an Order providing in pertinent part:

The summary judgment record contains testimony by Mr. King concerning his understanding of the effect of the March 20, 1999 memo. This testimony raises genuine issues of material fact as to whether the memo was simply preliminary negotiations and, therefore, unenforceable, or whether it documented an enforceable meeting of the parties' minds that King had an exclusive contract for Gurley to manage King upon the expiration of the King/In House Agreement and on the same terms as the King/In House Agreement. . . . Additionally, if at trial the Court finds that the March 20, 1999 memo constituted a contract with Gurley on the same terms as the King/In House Agreement, the memo does not violate the statute of frauds. Use of the same terms as the King/In House Agreement renders the memo subject to performance within a year because the contract terminates upon death.

The trial court then overruled Defendant's Motion for Summary Judgment.

With the case set for trial before a jury on August 18, 2003, King, on August 12, 2003, filed two motions in limine seeking to exclude Gurley's evidence and to rely upon the statute of frauds to bar the contract action. On August 14, 2003, Gurley filed her responses to these motions in limine.

At pretrial conference on August 15, 2003, the motions in limine were argued before the court, and, on August 15, 2003, the trial court entered an order providing:

This matter came before the Court on a pretrial conference, two business days before the jury trial of this case. During the conference, in conjunction with arguments on motions in limine, the defendant asserted various dispositive defenses which he argued were established of record as a matter of law. Although the defendant had previously filed and argued a motion for summary judgment and that motion was denied, the defendant presented the Court with new authorities and characterizations of legal arguments contending they were dispositive of the plaintiff's claims.

The deadline for dispositive motions having already passed and the Court having denied the defendant's motion for summary judgment, the Court was reluctant to consider the legal defenses raised by the defendant. However, if the defenses are

dispositive of the case as a matter of law, it is the duty of the Court, as gatekeeper of jury trials, to rule on those defenses and, despite the eleventh hour, dismiss the case if the Court concludes that dismissal is required by law.

Having reviewed the entire file, including consideration again of the motion for summary judgment and having read in their entirety the depositions of the parties, the Court concludes that the plaintiff's claims for breach of oral agreement and a written contract shall be dismissed as a matter of law. . . .

. . . .

With respect to the plaintiff's claim of recovery on an alleged written contract, the Court had previously ruled that there were genuine issues of material fact, for a jury to determine, whether there was a meeting of minds and a contract formed by the memorandum signed by the parties of March 20, 1999.

In considering at the pretrial conference the motions in limine and the proposed jury form and proposed instructions, the Court has concluded that the March 20, 1999 letter as a matter of law does not constitute a management contract. The letter is too indefinite and uncertain. The Court concludes that the letter, even if there were a meeting of the minds as to its contents, is an agreement to later define specific terms and enter into a management agreement, i.e. an agreement to attempt to agree. In this regard, in opposition to the motion for summary judgment, the plaintiff cited deposition testimony of the defendant as creating a genuine issue of material fact on whether there was a meeting of the minds with respect to the March 20, 1999 letter. The Court ruled that there was such a genuine issue of material fact. But what has become abundantly clear in preparing this case to present it to a jury is the absence of essential terms to form a management contract.

Specifically the March 20, 1999 letter, in addition to stating that the defendant will sign an exclusive management agreement with Cathy Gurley for a period of three years, also states, "The details of the agreement will be worked out later but will basically follow the same arrangement currently in place with In-House." What makes this unenforceable is it is impossible to know which terms of the In-House agreement the parties would have agreed to or, if modified, how they would have been modified. The In-House agreement is 7 pages in length. It details the management to be performed, options for renewal, defines gross earnings, power of attorney, etc.

In sum, the Court concludes that while there may be genuine issues of material fact on whether the parties agreed to later attempt to enter into a management agreement, that theory does not state a legal claim. The letter is not a management contract; it is incapable of enforcement or recovery because there is the

-19-

absence of essential terms concerning management. The Court, therefore, dismisses the plaintiff's claims for breach of a written contract.

In this same Order, the trial court holds that the alleged oral contract is barred by the statute of frauds. Thus, we have the trial court, following a hearing on motions in limine, *sua sponte* revisiting its previous action of July 14, 2003, overruling Defendant's Motion for Summary Judgment, reversing itself and sustaining the Motion.

The July 14, 2003, Order Overruling the Motion for Summary Judgment was clearly correct, and the *sua sponte* Order of August 15, 2003, sustaining the Motion for Summary Judgment is in error. The June 25, 2003, admissions by Defendant of the Additional Statement of Undisputed Material Facts for the purpose of summary judgment conclusively establish the existence of genuine questions of material fact precluding summary judgment. The trier of fact, not the trier of law, must determine these material questions of fact, including the significance of the details remaining to be formalized in writing after the March 20, 1999, letter signed by both parties.

While a purely oral contract standing alone would be barred by the statute of frauds, Tennessee Code Annotated section 29-2-101; *see Dickens v. Tennessee Electric Power Co.*, 137 S.W.2d 273 (Tenn.1940), it is equally clear that the March 20, 1999, letter, coupled with evidence of the surrounding circumstances as in *APCO Amusement*, would render the statute of frauds inapplicable. The March 20, 1999, letter provides a three-year term, and the referenced seven-page King/In House Agreement is terminable on death of a party.

There are many questions which cannot be answered by the summary judgment record, including the economic value of any recovery which might be obtained by Gurley, but such questions have little relevance to summary judgment.

The judgment of the trial court as to the breach of contract action is reversed, and the case is remanded to the trial court for trial on the merits.

Costs of appeal are assessed against Appellee.

_____
WILLIAM B. CAIN, JUDGE