IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 6, 2021 Session

## LVH, LLC v. FREEMAN INVESTMENT, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 19-515-I          Patricia Head Moskal, Chancellor**

_____

### No. M2020-00698-COA-R3-CV

_____

A property development company brought suit against a property owner for specific performance to enforce an option agreement entered into between the company and the property owner. The trial court held that the option agreement was enforceable and awarded specific performance and damages to the development company. We have concluded that the option agreement is not sufficiently definite with respect to the option price and, therefore, is not an enforceable contract. We reverse the decision of the trial court and remand for further proceedings regarding the development company's alternative cause of action for unjust enrichment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

J. Ross Pepper, Lara Elizabeth Boston Ford, and Matt E. Pulle, Nashville, Tennessee, for the appellant, Freeman Investment, LLC.

Thomas T. Pennington and Emma Boyd Elliott, Nashville, Tennessee, for the appellee, LVH, LLC.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a twelve-acre parcel of property ("the Property") near the Wedgewood-Houston neighborhood in Nashville. Freeman Investment, LLC ("FI") owns

the Property,[1] and Lucy Freeman serves as the managing member of FI. LVH, LLC ("LVH") is a company that purchases real estate for development projects.[2] LVH identified the Property as a possible site for a multi-family real estate development. Kent Campbell, vice president and corporate representative for LVH, negotiated with Hiram Lewis, FI's real estate broker, about LVH's possible purchase of the property.

In February 2018, LVH and FI entered into an option agreement ("the Agreement") granting LVH an exclusive option to purchase the property. In June 2018, the parties amended the Agreement to extend the option period to March 15, 2019. When LVH and FI entered into the Agreement, FI was owned by the three Freeman siblings—Lucy Freeman, Susan Freeman, and Paul Freeman—in equal shares. In August 2018, Paul transferred his shares to Lucy, who now owns two-thirds of the shares in FI.

The Property lies in a floodplain, and a large part of it lies in a floodway. When the parties signed the Agreement, the Property was zoned for industrial warehousing or distribution ("IWD"). After the Agreement was signed, LVH began its due diligence to determine the development potential of the Property. Contrary to LVH's original understanding, the Adaptive Residential Development standards were not applicable. For LVH to develop the Property as the company envisioned, the Metro planning commission required LVH to seek rezoning of the Property as a Specific Plan-Residential ("SPR") district. According to LVH, the company expended "significant resources" to complete the SPR approval process. LVH's specific plan received approval from the planning commission in August 2018 and from the Metro council in November 2018. The specific plan allowed for the construction of a maximum of 130 units on the Property.

The Freeman family's ownership of the Property dates back to a Revolutionary War grant. In 2000, Lucy Freeman recorded with the register of deeds a survey of the Property with her notarized affidavit, which states in part as follows:

> I, Lucy Ann Freeman, partner and administrative manager of Freeman Investment LLC, a Tennessee limited liability corporation, do submit for public record this survey of our property located at 1700 Nolensville Pike and on Moore Av. in Nashville, Davidson Co., Tennessee. This property is owned in full by Freeman Investment LLC and is shown as Tract 3 and Tract 4 of this survey dated July 2000.

As part of its due diligence process, LVH obtained a survey and title searches on the Property. A second title search revealed that there was a 70-foot strip within the Property that was owned by the three Freeman siblings rather than by FI. In a February 19, 2019

---

[1] For purposes of this appeal, we need not consider the effect of evidence indicating that a strip of the Property is not owned by FI but by the three Freeman siblings.

[2] LVH and Core Development, LLC are both owned by a parent company, Village People, LLC.

email to Mr. Campbell, LVH's attorney advised that, "Since all 3 siblings are part of the entity [FI], I don't see a big problem, but if you like we could revise the PSA [purchase and sale agreement] so it is between LVH and both the Freeman entity and all 3 siblings." Lucy Freeman testified that she learned of the siblings' ownership of part of the Property sometime after August 8, 2018.

On February 26, 2019, LVH notified FI by letter that LVH was exercising its option to purchase the property. In a draft contract of sale, LVH set forth a price of $2,500,000 for the Property. According to Mr. Campbell, LVH had determined that, under all applicable zoning and grading requirements, a maximum of 155 parking spaces could be constructed on the Property. Based upon the ratio of one parking space per bedroom and the mix of one-bedroom and two-bedroom units described in the Agreement, LVH calculated that 119 units could be developed on the Property. LVH applied the minimum contract price, based upon the construction of 125 units at a price of $20,000 per unit. In response to LVH's letter of intent to exercise the option, FI informed LVH that it was willing to sell the property at a price of $9,975,000.

LVH filed suit against FI in April 2019 for specific performance and unjust enrichment. In its amended answer, FI took the position that the Agreement was not an enforceable contract and that, if the Agreement was enforceable, LVH breached the contract by refusing to pay the agreed purchase price. After some discovery, both parties moved for summary judgment. In November 2019, the trial court determined that, under the terms of the Agreement, the purchase price was "sufficiently ascertainable to be enforceable" and that FI breached the contract. Therefore, the trial court granted partial summary judgment to LVH on these issues. Finding disputed facts or insufficient proof to determine damages and LVH's entitlement to specific performance, the court denied both parties' motions for summary judgment on those issues. The trial court further denied both parties' motions for summary judgment on the unjust enrichment claim.

The case proceeded to trial in November 2019 on the reserved issues. The court heard testimony from Mr. Campbell and Lucy Freeman. For the first time, FI asserted that specific performance was impossible because it did not own all of the property at issue. Based upon the uniqueness of the property, the trial court determined that compensatory damages were inadequate and that LVH was entitled to specific performance. The court further concluded that FI failed to prove impossibility of performance and that any discrepancy in the ownership or identification of the property was "subject to relatively easy corrective measures through execution of a quitclaim deed by the Freeman siblings to [FI]." The trial court ruled that LVH was entitled to delay damages for lost rental income from the tenant on the property (in the amount of $105,241.28).

FI appealed the trial court's decision and raises the following issues before this court: (1) whether the trial court erred by granting partial summary judgment to LVH that the Agreement was an enforceable contract and in denying summary judgment to FI that

the Agreement was not an enforceable contract; (2) whether the trial court abused its discretion in awarding LVH specific performance requiring FI to convey the property at issue via a general warranty deed for the price of 2.5 million dollars; and (3) whether the trial court erred in awarding compensatory damages to LVH for the lost rental value of the property.

ANALYSIS

I.      Summary judgment regarding enforceability of option agreement.

We must first determine whether the trial court erred in granting summary judgment to LVH and denying summary judgment to FI on the issue of the enforceability of the Agreement. LVH argues that the trial court properly concluded that the minimum price in the Agreement was "ascertainable" and that the Agreement is enforceable. FI counters that the price remained open to negotiation once the option was exercised and that the Agreement is merely an agreement to agree, which is unenforceable under Tennessee law.

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04.

The proper interpretation of a contract presents a question of law, which we review de novo with no presumption of correctness. *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005). The principles and guidelines of contract interpretation are well-established and include the following:

> "A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand* [*v. Pavletic*], 292 S.W.3d [618,] 630 [(Tenn. 2009)] (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)). We initially determine the parties' intent by examining the plain and ordinary meaning of the written words that are "contained within the four corners of the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citing *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011)).

The literal meaning of the contract language controls if the language is clear and unambiguous. *Allmand*, 292 S.W.3d at 630.

*Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). In determining the intent of the parties, a court should consider the parties' "situation, their motivations, their respective interests, and other contextual circumstances." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 692 (Tenn. 2019).

An option agreement is "'a unilateral contract whereby the optioner for a valuable consideration grants the optionee a right to make a contract of purchase but does not bind the optionee to do so.'" *Keck v. Meek*, No. E2017-01465-COA-R3-CV, 2018 WL 3199220, at *10 (Tenn. Ct. App. June 28, 2018) (quoting *Kwasniewski v. Lefevers*, No. M2012-01802-COA-R3-CV, 2013 WL 3964788, at *4 (Tenn. Ct. App. July 30, 2013)). For an option contract (or any contract) to be enforceable, "the parties must agree on the material terms." *Abbott v. Abbott*, No. E2015-01233-COA-R3-CV, 2016 WL 3976760, at *4 (Tenn. Ct. App. July 20, 2016). The contract terms must be "sufficiently definite to enable a court to give it an exact meaning." *United Am. Bank of Memphis v. Walker*, 1986 WL 11250, at *1 (Tenn. Ct. App. Oct. 10, 1986). Price is generally considered an essential term in a sales contract. *Abbott*, 2016 WL 3976760, at *4.

Both parties cite *Four Eights, LLC v. Salem*, 194 S.W.3d at 484, a case involving the enforceability of a tenant's option to purchase. The lease in *Four Eights* provided that the tenant would have the option to purchase the property at "its then fair market value" and that "Fair Market Value must be determined by the Lessor and Lessee, negotiating in good faith, within thirty (30) days of Lessee [sic] notice to Lessor of the election to purchase the Premises." *Four Eights*, 194 S.W.3d at 486. This court affirmed the trial court's determination that "there was no enforceable option to purchase." *Id.* at 486, 488. In reaching this conclusion, we stated:

> As the Trial Court found, if the parties had simply utilized the term "fair market value[,"] then the Court could have ascertained the same based on its common usage. By adding the provision that "Fair Market Value *must be determined* by the Lessor and Lessee, negotiating in good faith" (emphasis supplied), the parties basically made an "agreement to agree" to something in the future, and such agreements have generally been held unenforceable, both in this jurisdiction and others.
>
> For example, in the case of *United American Bank of Memphis v. Walker,* 1986 WL 11250 (Tenn. Ct. App. 1986), this Court stated:
>
> > In order for a contract to be binding it must spell out the obligation of the parties with sufficient definiteness that it can be performed.

- 5 -

All the essential terms of a contract must be finally and definitely settled. None must be left to determination, by future negotiations. It clearly appears from this writing that there was no definite contract or mutually agreed upon option to sell or any price determined in the agreement. As was said in the case of *King v. Dalton Motors, Inc.*, 109 N.W.2d 51 (Minn. 1961) in which a plaintiff purchaser had a "first option to purchase said property . . . at a price to be negotiated and to be agreeable between the parties at the time of the sale." The court refused to enforce this contract saying:

> It is a fundamental rule of law that an alleged contract which is so vague, indefinite and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable. Consequently where substantial and necessary terms are specifically left open for future negotiations, the purported contract is fatally defective. On the other hand, the law does not favor the destruction of contracts because of indefiniteness and if the terms can be reasonably ascertained in a manner prescribed in the writing, the contract will be enforced.

> Such a provision provides no standard for ascertaining the price or any other conditions of the sale and is, in our opinion, fatally uncertain and unenforceable in any form of action.

*Id.* at 486-87. Based upon these principles, this court determined that, "The option in this case was not definite enough regarding price such that specific performance could be decreed." *Id.* at 488.

In another case, *Huber v. Calloway*, No. M2005-00897-COA-R3-CV, 2007 WL 2089753, at *1-2 (Tenn. Ct. App. July 12, 2007), this court reversed the trial court's decision ordering an independent appraisal and requiring the sellers to sell the property to the buyers at the amount determined by the appraisal. On appeal, we determined that the option contract was not enforceable. *Huber*, 2007 WL 2089753, at *1. The operative provision in that case stated: "Purchase price to be mutually agreed upon based on [independent] appraisal at time of notice to sell." *Id.* The sellers argued that this language "requiring the parties to establish a mutually agreed upon price is merely an 'agreement to agree' and, therefore, unenforceable as a contract." *Id.* at *3. The buyers asserted that the provision that the price be based upon on independent appraisal "reflects that the parties had conclusively agreed on the mechanism by which the purchase price would be set." *Id.* This court adopted the sellers' argument, reasoning as follows:

[Buyers] vigorously maintain that the phrase "based on independant [sic] appraisal" reflects the parties' intention to set the selling price firmly at the price arrived at by a real estate appraiser. Although the language lacks specificity, it is not inconceivable that it could be of such a definite nature as to be enforceable if it stood alone. *See Graham County Elec. Cooperative, Inc. v. Town of Safford,* 322 P.2d 1078, 1080-81 (Ariz. 1958); *Hanna v. Bauguess,* 430 A.2d 104, 108-09 (Md. 1981). Far from standing alone, however, the vague language is juxtaposed with language that is crystal clear-"*price to be mutually agreed upon*"-the plain, unambiguous meaning of which is that the parties will complete their transaction only after they each agree on the selling price.

Although "based on independant [sic] appraisal" may have several plausible interpretations, the only possible meaning of the contract's language, in the context of the entire agreement, is that the parties agreed to open negotiations in the future regarding the purchase price of the land and that those negotiations would result in a sale only if the parties reached an agreement on price. *See Four Eights, LLC v. Salem,* 194 S.W.3d at 487. While it is beyond doubt that the parties envisioned that an independent appraisal would be incorporated into this process, any uncertainty in the language mandating an appraisal does nothing to change the requirement of mutual agreement.

[Buyers] ask us to ignore the clear language requiring mutual agreement and impose in its place their own interpretation of "based on independant [sic] appraisal." This we cannot do. The facts of this case do not present a situation in which the parties have agreed to an indefinite but ascertainable price. Neither have the parties explicitly agreed to a "reasonable" price derived from an appraisal. The clear implication is that the parties intended that a price would be negotiated in the future. This is perhaps a classic example of the "*agreement to agree.*" *See 1 Corbin on Contracts* § 4.3, at 572. Construing the parties' agreement as a whole, it is apparent that option agreement is not sufficiently definite to constitute a contract.

*Id.* at *5 (emphasis added) (footnote omitted); *see also Abbott*, 2016 WL 3976760, at *4, *6 (concluding that a deed provision giving the holder a right of first refusal to purchase property "once a price is agreed upon" was an unenforceable agreement to agree because the provision did not include "a sales price or a method to determine a sales price"); *Keltner v. Estate of Simpkins*, No. M2014-02023-COA-R3-CV, 2016 WL 1247704, at *1, *3 (Tenn. Ct. App. Mar. 29, 2016) (holding that a contract giving a buyer the option to purchase a tract of land, for which "a fair and equitable price . . . will be established at a

later date," was unenforceable because "the purchase price is not reasonably ascertainable from the plain terms of the contract").

In the present case, the key provisions of the Agreement regarding the option price state:

2. Option Price. *To be mutually agreed upon* by Buyer and Seller within thirty (30) days following the expiration of the Option Period, at a price of $20,000 per residential unit (upon project completion) that can be reasonably developed on the property, *subject to the following parameters*:

(a) Option Price to be based on a minimum of 125 units.
(b) Site and building development subject to Metro Bulk Regulations of current IWD zoning, as modified under Adaptive Residential Development standards.
(c) Building height limited to 30 feet at street setback, and not more than 4 stories where permitted by Slope of Height Control Plan (1.5 to 1).
(d) All parking requirements to be met by surface parking; structured parking will not be considered. Parking ratio of 1 space per bedroom.
(e) Unit mix to be approximately 70% 1 Bedroom and 30% 2 Bedroom, with average unit size of 860 square feet.
(f) All required storm water detention and treatment to be accomplished on site without use of underground storage.
(g) Site development subject to all governing authorities as pertains to floodplain development.
(h) Within fourteen (14) calendar days from expiration of the term of this Option or upon Buyer notifying Seller of its intention to exercise its option.

3. Option Earnest Money. Upon execution of this agreement, Buyer shall deposit with the Chas. Hawkins Co., Inc. twenty thousand and no/100 dollars ($20,000.00) as Earnest Money. Said Earnest *Money shall be either refunded to Buyer in the event buyer terminates this agreement or Buyer and Seller cannot agree to an Option Price* or partnership terms. The refunding of the Earnest Money, in the event that the Buyer terminates this Agreement, or the Buyer and Seller cannot come to an agreement on an Option Price or partnership terms, shall be contingent upon Buyer delivering to Seller any and all due diligence items, reports, etc. gathered during the Option Term. In the event Buyer does not deliver said items to Seller within five (5) business days of terminating this agreement or not coming to terms on an Option Price or partnership terms, Seller shall retain the Earnest Money as compensation.

(Emphasis added).

In arguing that the option price is reasonably ascertainable, LVH asserts that the price parameters set forth in paragraph 2 constitute a specific formula for computing the purchase price and do not leave the price open to future negotiation. We respectfully disagree. We must consider the Agreement provisions "in the context of the entire contract." *Huber*, 2007 WL 2089753, at *4 (citing *D & E Constr. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518 (Tenn. 2001), and *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999)). Although paragraph 2 does establish parameters for the purchase price, it also states that the option price is to be mutually agreed upon by the parties within 30 days of the end of the option period. Even if we could construe paragraph 2 as sufficiently definite on the price term, paragraph 3 provides that the earnest money is to be returned to the buyer in the event the buyer and the seller cannot agree on a price. The plain and unambiguous language of the Agreement contemplates that the option price is to be agreed upon by the parties and that the parties may not agree upon it. Thus, the price is not reasonably ascertainable by a court from the provisions of the agreement. *See Huber*, 2007 WL 2089753, at *5. Rather, the Agreement provides that the price will be determined "'by future negotiations.'" *Four Eights*, 194 S.W.3d at 487 (quoting *United Am. Bank of Memphis,* 1986 WL 11250, at *2).

We, therefore, conclude that the Agreement is no more than an agreement to agree and is unenforceable.[3] The trial court erred in granting summary judgment in favor of LVH and in denying FI's motion for summary judgment on this issue.

In granting LVH's motion for summary judgment on enforceability, the trial court concluded that this determination pretermitted LVH's alternative unjust enrichment claim. The court proceeded to find, however, that "there are genuine issues of material facts as to whether a benefit was conferred on [FI] and whether [FI] accepted that benefit." Furthermore, the court stated, there was "insufficient proof in the record as to [the] amount of damages relating to the unjust enrichment claim or the value of the benefit allegedly

---

[3] In *Gurley v. King*, this court distinguished between two types of preliminary agreements—one "where parties agree to later formalize a contract about which there has been complete agreement on all of the essential issues" and the other "where parties have committed themselves to some of the major terms, but other essential elements remain to be negotiated." *Gurley*, 183 S.W.3d 30, 40 (Tenn. Ct. App. 2005) (citing *Kandel v. Ctr. for Urological Treatment & Research, P.C.*, No. M2000-02128-COA-R3-CV, 2002 WL 598567 (Tenn. Ct. App. Apr. 17, 2002)). Although *Gurley* involved the first type of agreement, this court quoted a New York case stating that a preliminary agreement of the second type could give rise to "'the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework.'" *Id.* (quoting *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). Under Tennessee caselaw, however, such a duty to negotiate in good faith does not arise "absent an express contractual agreement." *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 644 (Tenn. Ct. App. 2006); *see also S.K. Servs. v. FedEx Ground Package Sys., Inc.*, No. 1:08-CV-158, 2008 WL 5204067, at *3 (E.D. Tenn. Dec. 11, 2008). There is no express provision imposing a duty to negotiate in good faith in the Agreement between LVH and FI.

conferred on [FI]." Therefore, the trial court denied LVH's motion for summary judgment on its alternative claim for unjust enrichment. The subsequent trial was limited to the issues concerning specific performance and damages from FI's breach of the Agreement. Because we have determined that the Agreement is not an enforceable contract, the unjust enrichment claim must be addressed on remand.

CONCLUSION

The judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion. Costs of this appeal are assessed against the appellee, LVH, LLC, and execution may issue if necessary.

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE