**ADMINISTRATIVE RESOURCES, INC., et al.**

v.

**BARROW GROUP, LLC, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

April 6, 2006 Session.

July 31, 2006.

Permission to Appeal Denied by Supreme Court Dec. 18, 2006.

Arthur M. Fowler, Johnson City, Tennessee, for the appellants, Administrative Resources, Inc., Rick Thomason and Sharon Thomason dba Payroll Transfer.

H. Frederick Humbracht, Jr., Nashville, Tennessee, for the appellees, Barrow Group, LLC and Robert G. Barrow, Jr.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

The plaintiffs sued their insurance agent and his company, under theories of breach of contract and negligence, claiming damages resulting from the agent's alleged failure to procure and maintain for the plaintiffs a master workers' compensation insurance policy at a discounted rate. At a bench trial, the court granted the defendants' motion for involuntary dismissal made at the conclusion of the plaintiffs' proof. They appeal. We affirm.

### I.

The plaintiffs, Rick Thomason and Sharon Thomason, own and operate the plaintiff Administrative Resources, Inc. ("ARI"). ARI is a type of entity known as a professional employer organization ("PEO"). Such entities provide long-term employee leasing for a fee. Specifically, a PEO leases employees to meet its customers' needs; it also provides payroll and benefit administration, workers' compensation and health insurance, tax filings, retirement planning, and other human resources services for the leased employees. In 1994, the plaintiffs engaged the services of defendant Robert G. Barrow, Jr., an insurance agent. Barrow is the principal owner of the defendant Barrow Group, LLC.[1] The defendants were engaged by the plaintiffs Thomason and the plaintiff ARI to procure workers' compensation insurance for ARI and its customers. Barrow introduced the plaintiffs to Waterford Insurance Limited, LLC ("Waterford"), a captive insurance company. By definition, a "captive insurance company" is a company that is owned by its members, i.e., its

insureds. Waterford was managed by Fireman's Fund Insurance Company. Waterford issued a single umbrella policy to ARI, i.e., a master policy, that covered all of ARI's employees. The rate for the master policy was set at a significant discount. This enabled ARI to pay less for workers' compensation coverage than its customers would have had to pay if they had obtained their own individual coverage. ARI made a profit by billing its clients at an amount higher than the discounted price.

In 1998, the plaintiffs formed another PEO, Payroll Transfer, for the purpose of shifting ARI employees working for higher-risk clients, e.g., construction companies, to another insurance policy. These employees "posed a greater propensity for injury than was acceptable for the Waterford program." Barrow procured workers' compensation coverage for Payroll Transfer through a program insured by American Alternative Insurance Company ("AAIC"). This program, like the Waterford program, provided a single master policy that covered all of the employees of Payroll Transfer. The net result of this was that two master workers' compensation policies, one through Waterford and one through AAIC, covered all of the plaintiffs' employees.

In December, 1999, Waterford informed its members that it anticipated a significant increase in premium charges for the upcoming year. Barrow subsequently sent Mr. Thomason a letter informing him of the "new trends and developments" in the compensation insurance market that likely sparked Waterford's increase in rates. The letter discussed the exodus of several insurers from the PEO market, and noted that those remaining in the market would

---

1. References in this opinion to "Barrow" or "Mr. Barrow" are intended to encompass the defendant Robert G. Barrow, Jr., as well as his company.

be tightening their requirements and increasing their rates. The letter stated that "Waterford ha[d] experienced a poor claim year." It went on to state that Mr. Thomason and Barrow needed to discuss other options available to ARI. In January, 2000, Waterford notified ARI that it was increasing ARI's 2000 renewal rate from 0.81% to 1.84%, a significant change.

In response to the increase by Waterford, Barrow provided ARI with other workers' compensation insurance quotes. On February 3, 2000, Barrow forwarded information regarding a plan insured by The Hartford. The Hartford plan required a $75,000 up-front payment. Barrow sent ARI a contract for its execution in the event ARI wished to participate in The Hartford plan. ARI never executed the contract. Barrow presented ARI with the additional option of temporarily transferring its employees to the AAIC policy that covered Payroll Transfer's employees. Mr. Barrow explained that he was in the process of establishing his own captive insurance company, and that when it was operational, his captive would be another option for ARI. After analyzing ARI's available options—stay with Waterford and pay a higher rate, switch to The Hartford plan, or temporarily transfer ARI's employees to the AAIC policy—the plaintiffs and Barrow agreed that it would be in ARI's best interest to add its employees to the AAIC policy until Barrow's captive was operational or until a better master policy quote could be procured. The plaintiffs state that Mr. Barrow told them that AAIC could handle all of ARI's employees and would be happy to get ARI's business. ARI's workers' compensation coverage through Waterford lapsed on March 1, 2000. At that point in time, ARI's employees were added to the AAIC policy.

On April 3, 2000, AAIC sent the plaintiffs a sixty-day notice advising them that their policy would be cancelled effective June 4, 2000. The notice stated that cancellation was due to "UNDERWRITING REASONS." (Capitalization in original). According to the plaintiffs, an employee of Barrow later told ARI's benefits coordinator, Kelli Barnett, that AAIC cancelled the policy because Barrow had failed to inform AAIC of the transfer, which, in effect, tripled AAIC's risk. The plaintiffs claim that they immediately called Barrow to discuss accepting The Hartford quote. They state that Mr. Barrow responded by telling them not to worry because his captive would be operational before the effective date of the cancellation, i.e., before June 4, 2000. The plaintiffs further testified that, when they later contacted Mr. Barrow again with regard to accepting The Hartford quote, he informed them that the quote had expired and was no longer available.

Mr. Barrow states that he attempted, albeit unsuccessfully, to procure other PEO workers' compensation insurance programs for ARI and Payroll Transfer during April and May. The plaintiffs state that, during this period, Mr. Barrow assured them that either his captive or another insurance company would provide them with a master policy. They claim that, as time passed, Barrow failed to offer any options or encourage them to pursue other avenues. In mid-April, Mr. Thomason began writing letters to Barrow expressing his continuing concern over the lack of a replacement master policy and the fact that time was running out. Mr. Thomason states that he finally spoke with Mr. Barrow on May 31, 2000, i.e., four calendar days before the effective date of the AAIC cancellation. Barrow was optimistic that he could get AAIC to rescind the cancellation, and, at the time, he was waiting on a call back from AAIC. In the end, AAIC refused to rescind the cancellation.

On June 2, 2000, at approximately 4:45 p.m., an employee of Barrow contacted the plaintiffs and requested that they send an immediate wire transfer in the amount of $161,000 so that the clients of ARI and Payroll Transfer could be temporarily placed in the assigned risk pool. Coverage through the assigned risk pool took effect on June 4, 2000. According to the plaintiffs, the "exorbitant" cost of workers' compensation coverage through the assigned risk pool caused them to lose profits and market share. On June 5, 2000, Mrs. Thomason and Ms. Barnett met with Mr. Barrow to discuss the situation. Mr. Barrow stated that he was ninety percent sure that his captive would be up and running by July 1. He also stated that he had submitted ARI and Payroll Transfer for underwriting with Cedar Hill Insurance Agency, and that he was waiting for a response from them.

Nothing came of the options discussed at the June 5, 2000, meeting. Mr. Barrow's captive was never established. The plaintiffs terminated their relationship with Barrow sometime around August, 2000. They engaged the services of another insurance agent, who obtained individual policies for the customers of ARI and Payroll Transfer outside the assigned risk pool. The agent was unable to procure a master policy for either ARI or Payroll Transfer. The plaintiffs changed insurance agents again, but the third agent was also unsuccessful in procuring a master policy.

The plaintiffs filed this action, alleging (1) that Barrow breached a contract to "timely procure workers' compensation coverage at a lower premium," and (2) that Barrow was negligent in failing to obtain a master workers' compensation policy at a discounted rate. Barrow denied the allegations and asserted that the failure to obtain the desired insurance coverage was due to uncontrollable changes in the compensation insurance market. The plaintiffs claim that they were placed at a competitive disadvantage by not having a single master workers' compensation policy with a discounted rate. The complaint alleges $2,000,000 in damages resulting from "increased workers' compensation premiums" and "loss of business growth."

Following the conclusion of the plaintiffs' proof at trial, Barrow moved for involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02. The trial court granted Barrow's motion, concluding, in pertinent part, as follows:

Plaintiffs failed to introduce any evidence of a contract with Barrow by which he agreed to provide them a master policy at any rate, much less a discounted rate.

Plaintiffs likewise failed to introduce any evidence that any insurance company would have issued a master policy to [ARI] at any rate, much less a discounted rate. Plaintiffs failed to introduce any evidence of what discounted premiums were available in the market at this time even if a master policy had been procured. In fact, Mr. Thomason testified that his volume of premiums, an amount below $1,000,000, made him ineligible for programs that offered discounted premiums. Likewise, the testimony was that even with a master policy the discounted rates would vary from program to program or carrier to carrier. Indeed, it appears that [ARI] currently receives some discount, but the discount may not be as great as that which [ARI] had at one time with Waterford and it does not result from a master policy.

During the course of the trial, Plaintiffs' counsel was asked if he could "show that there was other insurance you could have gotten at a favorable rate?" While

counsel stated "Yes", no such evidence was introduced. Likewise, no evidence was introduced that [ARI] could qualify for a master policy at discounted rates or even what discounted rates were available in the marketplace.

This case does not involve a claim that as a result of the failure to obtain a policy, the insured suffered a loss that would otherwise have been insured. The coverage afforded by workers' compensation policies is the same whether it is procured in the open market or from the assigned risk pool. Therefore, coverage is not the issue. This case is solely about economic losses sustained because Plaintiffs claim [Barrow] failed to obtain a master policy at a discounted premium. In order to support the claim for damages, Plaintiffs must show that [Barrow was] negligent in the failing to procure a master policy at a discounted premium, and that the alleged negligence caused them to suffer economic loss. In order to prove causation, Plaintiffs must establish they were eligible for a master policy with a discounted premium and that master policies with discounted premiums were available and could have been obtained for them.

The Court concludes that Plaintiffs have failed to meet their burden of proof to show that [Barrow's] negligence, if any, caused them damage.

(Numbering in original omitted). The plaintiffs appeal.

## II.

The plaintiffs state their issues on appeal as follows:

1. Whether the trial court erred in granting [Barrow's] Motion for Involuntary Dismissal and finding that [the plaintiffs] had failed to present a prima facie case of negligence by proving that [Barrow] failed to use reasonable care and diligence in continuing [the plaintiffs'] insurance and failed to inform [the plaintiffs] that they could not obtain another master policy?

2. Whether the trial court erred in granting [Barrow's] Motion for Involuntary Dismissal and finding that [the plaintiffs] had failed to present sufficient evidence to establish that [Barrow] had breached their contract with [the plaintiffs] to create a captive insurance company to provide [the plaintiffs] with a master policy?

3. Whether the trial court erred in placing the burden on [the plaintiffs], not [Barrow], to prove that no insurance company would have issued a master workers' compensation insurance policy covering the [p]laintiffs as such a defense is an affirmative defense, and was not a part of the [p]laintiffs' prima facie case?

## III.

In the case of *Atkins v. Kirkpatrick*, we addressed how a trial court is to consider a Rule 41.02 motion for involuntary dismissal:

If a motion to dismiss is made at the close of Plaintiffs' proof in a non-jury case, under T.R.C.P. Rule 41.02 the trial court must impartially weigh and evaluate the evidence just as though it were making findings of fact and conclusions of law after presentation of all the evidence. If the plaintiff's case has not been established by a preponderance of the evidence, the case should be dismissed if, on the facts found in [sic] the applicable law, plaintiff has shown no right to relief. *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734 (Tenn.1977).

*Atkins*, 823 S.W.2d 547, 552 (Tenn.Ct.App. 1991); *see Smith v. Inman Realty Co.*, 846 S.W.2d 819, 822 (Tenn.Ct.App.1992); *Der-*

*ryberry v. Hill,* 745 S.W.2d 287, 290 (Tenn. Ct.App.1987).

■ Our standard of review of a trial court's decision to grant an involuntary dismissal under Rule 41.02 is in accordance with Tenn. R.App. P. 13(d). *Atkins,* 823 S.W.2d at 552; *Irvin v. City of Clarksville,* 767 S.W.2d 649, 653 (Tenn.Ct.App.1988); *Derryberry,* 745 S.W.2d at 290. Thus, we are required to review the record *de novo* and to presume that the factual findings of the trial court are correct, unless the evidence preponderates otherwise. Tenn. R.App. P. 13(d); *Atkins,* 823 S.W.2d at 552; *Irvin,* 767 S.W.2d at 653; *Derryberry,* 745 S.W.2d at 290. We give weight to the trial court's assessment of the evidence because it is in a better position to evaluate the credibility of the witnesses. *Thompson v. Adcox,* 63 S.W.3d 783, 787 (Tenn.Ct.App.2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower court[ ]." *S. Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001).

IV.

■ The plaintiffs first argue that the trial court's grant of Barrow's motion for involuntary dismissal was inappropriate because, according to the plaintiffs, they sufficiently established all of the elements for an action for negligence. A successful negligence claim requires that a plaintiff establish, by a preponderance of the evidence, each of the following elements:

(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause.

*McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn.1995) (citations omitted). Whether a plaintiff is owed a duty of care is a question of law to be determined by the court. *Coln v. City of Savannah,* 966 S.W.2d 34, 39 (Tenn.1998). The plaintiffs argue that Mr. Barrow breached his duty to use reasonable care and diligence (1) by not notifying AAIC of the transfer which caused AAIC to cancel the plaintiffs' policy; (2) by allowing AAIC to unlawfully cancel the policy; (3) by not accepting The Hartford quote and allowing it to expire; (4) by failing to timely notify the plaintiffs that he could not obtain a replacement master policy; and (5) by failing to implement his own captive insurance company. We hold that the evidence preponderates against the plaintiffs' charges of negligence on the part of Barrow.

■ The plaintiffs' argument regarding the cause of the AAIC policy cancellation and Barrow's alleged failure to notify AAIC of the transfer is not supported by a preponderance of the evidence. The reason given by AAIC for the cancellation was that of "underwriting reasons," nothing more. The charge that Barrow was negligent in "allowing" AAIC to "wrongfully terminate coverage" is also unfounded. To support the assertion that the cancellation was unlawful, the plaintiffs cite Tenn. Code Ann. § 56–7–1803 (2000), which provides as follows:

After a commercial risk insurance policy has been in effect for sixty (60) days, or, if the policy is a renewal, effective immediately, no notice of cancellation shall be effective unless it is based on the occurrence, after the effective date of the policy, of one (1) or more of the following:

(1) Nonpayment of premium, including nonpayment of any additional premiums, calculated in accordance with the current rating manual of the insurer, justified by a physical change in the insured

property or a change in its occupancy or use;

(2) Conviction of the named insured of a crime having as one (1) of its necessary elements an act increasing any hazard insured against;

(3) Discovery of fraud or material misrepresentation on the part of either of the following:

(A) The insured or the insured's representative in obtaining the insurance; or

(B) The named insured in pursuing a claim under the policy;

(4) Failure to comply with written loss control recommendations;

(5) Material change in the risk which increases the risk of loss after insurance coverage has been issued or renewed;

(6) Determination by the commissioner that the continuation of the policy would jeopardize a company's solvency or would place the insurer in violation of the insurance laws of this state or any other state;

(7) Violation or breach by the insured of any policy terms or conditions; or

(8) Such other reasons that are approved by the commissioner.

*Id.* The plaintiffs contend that Barrow "had a duty to determine what action caused the attempted cancellation, and prevent the cancellation" because underwriting reasons is not an occurrence listed by the above statute. The plaintiffs may have a claim against AAIC if the cancellation was, in fact, in violation of Tenn.Code Ann. § 56–7–1803, but there is absolutely nothing to suggest that Barrow had the power, much less a duty, to require AAIC to rescind the cancellation.

■ The plaintiffs' third argument is that Barrow breached his duty of reasonable care and diligence by not accepting The Hartford quote and allowing it to expire. However, the record clearly shows that Barrow presented The Hartford quote to the plaintiffs with an application to be completed upon their acceptance of the quote. Both the plaintiffs and Barrow analyzed and discussed the quote and other workers' compensation insurance options available at the time. The plaintiffs decided to go with the option of transferring ARI's employees to the AAIC policy. Later, after AAIC cancelled the plaintiffs' policy, Mr. Thomason called Barrow to discuss accepting The Hartford quote. It is at this point that Barrow allegedly told the plaintiffs not to worry because his captive would be operational by the effective date of the cancellation. There is nothing to suggest that the plaintiffs instructed Barrow to accept The Hartford quote or that Barrow ignored such an instruction. After more time had passed, Mr. Thomason again called Barrow and requested that he accept the quote, but it was too late—the quote had already expired. The evidence preponderates that Barrow used reasonable care and diligence in his handling of The Hartford quote.

■ The plaintiffs next argue that Barrow breached his duty by failing to timely notify them that Barrow could not procure a replacement master policy. The plaintiffs contend that Barrow constantly assured them that he would locate a master policy for the plaintiffs. The preponderance of the evidence is, however, to the contrary. Barrow made the plaintiffs aware of the problems in the PEO insurance market. The plaintiffs were well aware of Barrow's difficulties in locating a replacement master policy, much less one with a discounted rate. As a somewhat intertwined argument, the plaintiffs contend that Barrow breached his duty by failing to implement his captive insurance company, or by failing to notify the plaintiffs that his captive would not be operational in time to provide them with a re-

placement master policy. This allegation, too, is without merit. Barrow, when discussing the captive as an option for the plaintiffs, made it clear that the captive was not operational as of yet, but that he anticipated that it would be up and running in the near future. The reason behind Barrow's ultimate failure to establish a captive insurance company is not clear from the record. The evidence preponderates against a finding that Barrow was negligent in either (1) failing to set up his captive, or (2) failing to notify the plaintiffs that the captive would not be operational in time.

The plaintiffs rely extensively on the case of *Wood v. Newman, Hayes & Dixon Ins. Agency*, 905 S.W.2d 559 (Tenn.1995) to support their negligence claim against Barrow. In *Wood*, the Supreme Court stated that an insurance agent, who is employed to maintain insurance coverage for a client, may be found liable under a negligence theory "if the agent fails to use reasonable care and diligence in continuing the insurance, either by obtaining a renewal or replacement policy or by properly maintaining an existing policy." *Id.* at 562; *see Ezell v. Assoc. Capital Corp.*, 518 S.W.2d 232, 234 (Tenn.1974); *Massengale v. Hicks*, 639 S.W.2d 659, 660 (Tenn.Ct. App.1982). Additionally, "the agent is charged with an affirmative duty to notify the client if he is unable to continue the previous coverage, and the failure of the agent to so notify the client will subject him to liability." *Wood*, 905 S.W.2d at 562.

The plaintiff in *Wood* operated a marina. *Id.* at 560. The defendant insurance agent had procured an "all-risk" insurance policy for the plaintiff's marina for several years. *Id.* The insurance carrier subsequently notified the plaintiff and the defendant that the "all-risk" policy would not be renewed. *Id.* The defendant tried to procure a replacement policy that covered all risks, but

the only insurance he could locate covered "named perils," of which ice and snow damage was not included. *Id.* The plaintiff accepted one of the new policies procured by the defendant. *Id.* Shortly thereafter, a snow storm caused severe damage to the plaintiff's marina. *Id.* at 560–61. The carrier denied the plaintiff's insurance claim, citing the policy's lack of ice and snow damage coverage. *Id.* at 561. The plaintiff sued the insurance agent, alleging negligence for his failure to procure a replacement policy that covered ice and snow damage, and for failing to inform the plaintiff that the new policy did not cover ice and snow damage. *Id.* The defendant denied negligence, but also argued that, if his actions constituted negligence, they were not the proximate cause of the injury because he could not locate an "all-risk" replacement policy in the marketplace. *Id.* The trial court held that the agent owed the plaintiff a duty to disclose any material changes in the replacement policy, and that he had breached this duty by failing to inform her of the specific perils which were and were not covered by the new policy. *Id.* The court also found that this breach was the proximate cause of the plaintiff's loss. *Id.*

The Court of Appeals reversed the trial court's ruling, finding that the defendant's failure to disclose, even though negligent, was not the cause in fact of the plaintiff's injury. *Id.* at 561–62. The Court's reasoning behind this finding was as follows:

> The seminal question in the case at bar is whether defendant's negligence was the cause in fact of plaintiff's injury; that is, whether plaintiff's losses would not have occurred 'but for' ... the negligence of the defendant. At trial, both [the defendant insurance agent] and [the plaintiff's insurance expert] testified that all-risk insurance was simply unavailable during the [time that the defendant was

seeking a replacement policy], and for some time thereafter, given the market conditions. Even if [the defendant] had made [the plaintiff] fully aware of the lack of snow and ice coverage in the new policy, [the plaintiff] would not have been able to do anything to thwart her losses, apart from shutting down the marina, which she was unwilling to do.... Although [the defendant] negligently breached his duty to inform, he cannot be held responsible for [the plaintiff's] losses because his negligence was not the cause in fact of the damage sustained.

*Id.* at 562 (internal footnote omitted). Notably, the Court found that the negligent procurement claim was unsupported by the evidence. *See Id.*

On appeal, the Supreme Court agreed with this Court's finding with respect to the negligent procurement claim, and addressed the specific issue of whether the plaintiff's loss would have occurred "but for" the defendant's failure to inform the plaintiff that the replacement policy did not provide the same coverage as the previous policy. *Id.* The Court found in favor of the plaintiff, stating that

[d]espite the defendant's argument that [the plaintiff] would not have done anything differently had [she] been informed that the replacement policy did not cover ice and snow damage, we, ..., refuse to speculate as to what [she] would or could have done had they been notified. The exercise is not only futile, given the range of human ingenuity, it is irrelevant: the fact is that the agent's failure to inform [the plaintiff] of the change in coverage completely denied [her] any opportunity to explore other methods of protecting their property.

*Id.* at 564.

▇ Though the arguments and themes addressed in *Wood* are somewhat similar

to those raised in the instant case, an important factual difference distinguishes the two cases. In *Wood*, the plaintiff alleged that the defendant's failure to obtain a policy covering ice and snow damage, and the defendant's failure to disclose the fact that the replacement policy did not cover ice and snow damage, caused her injuries. *Wood* is a lack of coverage case; therefore, the duty cited in the case and the case's holding must be read in that context. In this case, the plaintiffs argue that Barrow was negligent in failing to obtain or maintain a master policy that offered a discounted rate, and in failing to timely notify the plaintiffs that he could not procure such a master policy. This case does not present a coverage issue. Barrow procured coverage for the plaintiffs. As found by the trial court, and as testified to by the plaintiffs' own insurance expert, "[t]he coverage afforded by workers' compensation policies is the same whether it is procured in the open market or from the assigned risk pool." Granted, the coverage procured by Barrow did not come with the low premium desired by the plaintiffs or in the form of a master policy, but, at no time, were the plaintiffs without workers' compensation coverage.

▇ Even if we assume, for the purpose of argument, that Barrow's actions rise to the level of a breach of duty, the plaintiffs still have a problem establishing causation. "Causation [in fact] and proximate cause are distinct elements of negligence, and both must be proven by the plaintiff by a preponderance of the evidence." *Kilpatrick v. Bryant,* 868 S.W.2d 594, 598 (Tenn.1993). "The defendant's conduct is the cause in fact of the plaintiff's injury if, as a factual matter, it directly contributed to the plaintiff's injury ....we must ask whether the plaintiff's injury would have happened 'but for' the defendant's act." *Hale v. Ostrow* 166

S.W.3d 713, 718 (Tenn.2005). The record shows that, given the market conditions, a master policy similar to what the plaintiffs previously had with Waterford was unavailable. The plaintiffs, both Mr. and Mrs. Thomason, testified that one needed at least $1,000,000 in premiums to qualify for a master policy, and that they did not meet this threshold requirement at the time that Barrow was searching for a replacement master policy. Furthermore, the two insurance agents that later attempted to locate insurance for the plaintiffs also were unable to procure a master policy. The plaintiffs failed to introduce any evidence showing that there was a master policy to be had by the plaintiffs; therefore, we cannot say that the plaintiffs' economic losses, *i.e.*, their higher cost of workers' compensation insurance coverage and loss of business growth, would not have occurred "but for" Barrow's actions. *See Kilpatrick*, 868 S.W.2d at 598. If the market was such, as the preponderance of the evidence indicates, that nobody could have located a master policy for the plaintiffs, then it cannot be that Barrow caused the plaintiffs' economic losses.

◼◼◼ Here, we find it appropriate to also discuss the third issue raised by the plaintiffs: Did the trial court err by finding that the plaintiffs, not the defendants, had the burden of proving that an insurance company existed that would have issued a master policy covering the plaintiffs? The plaintiffs assert that Barrow raised the issue of whether any insurance company would have provided the plaintiffs with a master policy as an affirmative defense in his answer; thus, according to the plaintiffs, Barrow, not the plaintiffs, had the burden of proof. *See Ass'n of Owners of Regency Park Condo. v. Thomasson*, 878 S.W.2d 560, 566 (Tenn.Ct.App. 1994). "An affirmative defense pleads a matter that is not within the plaintiff's

prima facie case." *George v. Alexander*, 931 S.W.2d 517, 527 (Tenn.1996) (Reid, J., concurring) (citing 2A James W. Moore, et al., *Moore's Federal Practice* 8.27[1] (2d ed.1995)). As discussed by the trial court and by the preceding paragraph of this opinion, the existence of an insurance company willing to provide the plaintiffs with a master policy is necessary in this case to determine whether the plaintiffs would not have sustained their losses "but for" Barrow's actions. The evidence clearly shows that the market conditions caused the plaintiffs' economic losses. The plaintiffs were required to provide evidence to the contrary, *i.e.*, evidence establishing that there was a master policy or, at a minimum, other comparable insurance coverage, available to them in the market at a lesser cost than they ended up paying. Their failure to provide such evidence leaves an essential element of their negligence claim—the cause in fact element—without support in this record.

### V.

◼◼◼ The plaintiffs also contend that the trial court erred in finding that they failed to present sufficient evidence to establish that Barrow breached a contract by not creating his captive insurance company. The plaintiffs claim that Barrow "offered to establish a captive workers' compensation insurance program in which the [p]laintiffs would become members," and that they accepted this "offer." Notably, this contract argument by the plaintiffs is somewhat different from the argument presented to the trial court. In their complaint, the plaintiffs more generally argue that Barrow "breached its contract with [the p]laintiffs to timely procure workers' compensation coverage at a lower premium." The plaintiffs assert, in their reply brief to this Court, that the two contract arguments are one and the same because Barrow "lulled them into believing that

[his] captive would be ready and would provide them with a master workers' compensation policy upon [AAIC's] expiration." We hold that, no matter how the plaintiffs categorize their breach of contract claim, the evidence preponderates against a finding that Barrow breached a contract to provide a master policy at any rate.

■■■■ A valid and enforceable contract, whether express, implied, written, or oral

> must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced.... In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer."

*Jamestowne on Signal, Inc. v. First Federal Sav. & Loan Ass'n.*, 807 S.W.2d 559, 564 (Tenn.Ct.App.1990) (citations omitted). The evidence introduced regarding Barrow's captive shows that both parties were well aware, at all times, that the captive was in the planning stage and not operational. Both parties anticipated that the captive would be up and running in the near future. In June, 2000, Barrow stated that he was ninety percent sure that the captive would be ready by July 1, 2000. We can even say that it was understood that, *when the captive was finally operational,* ARI could become one of its members. However, for whatever reason, the captive was never operational. There is simply no evidence to suggest that the parties mutually agreed in contract that the captive would eventually be created, and that the captive would provide a master policy to the plaintiffs.

## VI.

The judgment of the trial court is affirmed. This matter is remanded to the trial court for the collection of costs assessed below, pursuant to applicable law.

Costs on appeal are taxed to the appellants, Administrative Resources, Inc., and Rick Thomason and Sharon Thomason dba Payroll Transfer.