# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
JUNE 16, 2010 Session

## RANDY EARLS v. JOE D. BLANKENSHIP, M.D., D/B/A MEDNORTH CLINIC, PLLC

### Direct Appeal from the Chancery Court for Madison County
No. 64460      James F. Butler, Chancellor

### No. W2009-01959-COA-R3-CV - Filed August 16, 2010

This appeal involves a dispute between an employee and his employer regarding whether the employer agreed to pay off the employee's student loans as part of his employment compensation package.  Following a bench trial, the trial court found that no valid contract existed, and it dismissed the employee's complaint.  The employee appeals.  We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Beau E. Pemberton, Dresden, Tennessee, for the appellant, Randy Earls

M. Scott Smith, Jackson, Tennessee, for the appellee, Joe D. Blankenship, M.D.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Plaintiff, Randy Earls, is a nurse practitioner. Defendant, Dr. Joe Blankenship, is a practicing physician who operates MedNorth Clinic, PLLC, in Jackson, Tennessee. Mr. Earls was employed at MedNorth from August of 2005 until February of 2007. On February 13, 2007, Mr. Earls instituted this lawsuit against Dr. Blankenship doing business as MedNorth. Mr. Earls alleged that one of the terms of his employment was that his student loans, which totaled $86,000, would be assumed and repaid within a three-year period. Mr. Earls alleged that Dr. Blankenship had breached the parties' employment contract by failing to satisfy the student loan payments as agreed. He initially sought damages in the amount of $86,000, plus interest and attorney's fees, but he later amended his complaint to seek only $43,000 in damages, due to the fact that he quit working for Dr. Blankenship after eighteen months.

Dr. Blankenship filed an answer to the complaint in which he denied that he had agreed to assume Mr. Earls' student loan obligations. Dr. Blankenship also asserted that Mr. Earls' action was barred by the statute of frauds.

A bench trial was held over the course of several days. It was undisputed that the parties did not enter into a formal, written employment contract when Mr. Earls was hired. In August of 2005, Mr. Earls and Dr. Blankenship had met at Dr. Blankenship's office and had a lengthy conversation about Mr. Earls' potential employment at MedNorth, but the parties presented conflicting testimony regarding the content of that conversation. Mr. Earls testified that the parties' discussed three components of his expected compensation: salary, bonuses, and student loan repayment. According to Mr. Earls, Dr. Blankenship stated that his salary would be $65,000 per year and that he would receive quarterly bonuses that "would be enough to buy [his wife] a new car every three months." Mr. Earls testified that the parties also discussed the issue of his student loans and the fact that they totaled about $86,000 at that time. According to Mr. Earls, Dr. Blankenship stated that "we could make those disappear over three years. For each year of service, one-third would be taken care of." Mr. Earls further testified:

A. We would talk about the bonus packages and school loans and to get further details with those, and he would say if a young man was wanting to work here and prove himself that he could make things disappear. . . .

Q. Was there any doubt in your mind when you left there what your compensation pa[ck]age was going to be as an employee as a nurse

-2-

practitioner there with MedNorth Clinic?

A. I knew what my salary was. I knew the bonuses were going to be somewhere around to buy [my wife] a new car and that the school loans would be paid in quarterly – I mean, yearly for three years until they were resolved in three years after employment – after three years of service.

In sum, Mr. Earls testified that he expected to receive, each year, a salary of $65,000, quarterly bonuses of at least $20,000 each, and repayment of one-third of his student loans, which would amount to approximately $29,000 per year. Mr. Earls' now ex-wife, who had also attended the meeting, similarly testified that when she left the meeting, it was her impression that Mr. Earls "had the job" and that his student loans would be repaid in three years. She said it was her understanding that Dr. Blankenship was going to divide the total amount by three years, then divide by twelve months, so that he would be paying approximately $2,500 toward Mr. Earls' student loan obligation each month.

During his testimony, Mr. Earls acknowledged that he was only paid $55,000 or $57,000 per year by his previous employer, and that the "compensation package" he expected from MedNorth would total over $173,000 per year. However, he said, "that's what I expected based on what [Dr. Blankenship] said." Counsel for Dr. Blankenship then read into evidence Mr. Earls' deposition testimony, in which he had testified:

[Dr. Blankenship] gave me scenarios if he did this and then he – when I left that night – let me clarify this.

I didn't know if I had the job or not. He wouldn't commit to anything that night when I left. He threw several, several different things out there he could do for me if I would leave if a young man was looking to do such a job and wanted this and was willing to accept that . . . .

In any event, Mr. Earls went to work for MedNorth soon after the August 2005 discussion, and he continued to make the payments on his student loans throughout the next year. Mr. Earls said that "not much was really mentioned" about his student loans that year, but that "it really wasn't an issue because we had an agreement that it was going to be one-third paid at the end of the first year of service." However, he testified that he and Dr. Blankenship did have "heated discussions" about the timing and amount of his bonuses.

Mr. Earls and Dr. Blankenship had another meeting on August 11, 2006. According to Mr. Earls, the purpose of this meeting was "[t]o put things on paper that we had discussed the year previously." Mr. Earls introduced into evidence a photocopy of a sheet of paper that contained various calculations and notations, which Mr. Earls characterized as a written

contract produced during the August 2006 meeting. A copy of the alleged contract is attached as an addendum to this opinion. The document is entirely handwritten and, in some areas, illegible. The parties agreed that it was mostly in Dr. Blankenship's handwriting.[1] According to Mr. Earls, the document reflects the parties' agreement that Dr. Blankenship would assume his student loan obligation and repay his loans in three years. He pointed out that the document includes the following calculation:

Total Loans
24,366.55
22,302.89
39,891.73
86,561.17 ÷ 3 = $28,853.72/YR.

However, Mr. Earls further testified that after the parties had been discussing his student loans for some time, Dr. Blankenship put the document aside and said he was going to simply repay all of the student loans at once. Mr. Earls testified,

> The last thing he said – my understanding when I was at that office that night – that this piece of paper was drawed up as we talked and talked about everything, put it on paper, and all of a sudden he just puts the paper aside and looked at me and told [m]e, he said, "You know," he said, "these really do bother you, don't they?"
> I said, "Yes, sir." He said, "Well, I tell you what I'm going to do. I'm going to take care of them." I said, "What are you telling me?" He said, "I'm telling you that you will never have to worry about those school loans again. You're not going to pay one penny towards those school loans."
> I said, "What are you telling me?" He said, "I'm telling you I want your paycheck to go in your pocket and you're not going to worry about these any more. And that's pretty good. I did in one year what I said I was going to do in three years."
> So that's how come I have the paper, because it was not even an issue when I left that office that night.

Mr. Earls testified that after the August 2006 meeting, he asked Dr. Blankenship on several occasions when the loans would be paid off and that Dr. Blankenship did not seem to want to talk. It was undisputed that MedNorth made payments of $59.57 directly to

---

[1] There is a "box" drawn to the left of the page, containing the address of MedNorth Clinic and a highlighted notation that appears to say, "Address ▵[,] due Oct 4, 2006 @ 1715!" Both Mr. Earls and Dr. Blankenship testified that this notation was not in their handwriting.

EdFinancial Services on Mr. Earls' student loan in August, September, October, and November of 2006. MedNorth also paid Mr. Earls' standard monthly student loan payment of $259.52 directly to Sallie Mae on five occasions in September and November.[2] Mr. Earls testified that on February 5, 2007, he learned that his student loans were in default and had not been paid since November. Mr. Earls testified that this fact, along with other circumstances, led him to terminate his employment relationship with MedNorth.

Dr. Blankenship's recollection of the parties' conversations was vastly different. Dr. Blankenship testified that the parties' initial meeting in August of 2005 was informal and after-hours, and meant to allow the parties to introduce themselves and explore the possibility of whether MedNorth would consider hiring a nurse practitioner. Dr. Blankenship testified that while the parties did discuss Mr. Earls' potential employment that night, they "made no commitments to anything." Dr. Blankenship also testified that "the subject of school loans was never brought up" at the parties' initial meeting. Dr. Blankenship explained that he first learned of Mr. Earls' student loans a few months into his employment at MedNorth, when Mr. Earls approached him and explained that he was having "money problems" and needed more money. Dr. Blankenship recalled that Mr. Earls said that there had been a change in the status of his student loans so that he had to begin making payments on the principal, and in addition, Mr. Earls reported having financial issues due to a divorce. Dr. Blankenship testified that he and Mr. Earls had several conversations during his first year of employment during which Mr. Earls generally complained that he was not getting paid enough money.

Dr. Blankenship said that during that first year of Mr. Earls' employment, he had intentionally avoided entering into an employment contract with Mr. Earls because of numerous behavior problems Mr. Earls displayed at work. Dr. Blankenship explained that Mr. Earls was unable to control his temper, made inappropriate comments to patients, was constantly fighting with the nurses, and had excessive absences. He said "it was not by accident that he did not have a contract by August '06." However, Dr. Blankenship testified that Mr. Earls had repeatedly approached him and requested that they "get together and talk about contracts, money, et cetera," so in August 2006, the parties had their second "big meeting." Dr. Blankenship testified that the document produced during that meeting reflected the notes he took during the parties' conversation, and that it was not intended to be a written contract. Dr. Blankenship described himself as a "note taker" and said that he

_____

[2] According to MedNorth's records, it paid Mr. Earl's standard monthly payment of $114.10 to Edfinancial Services seven times between September 2006 and January 2007, and it made five payments of $259.52 and two payments of $266.36 to Sallie Mae during those same months. MedNorth also wire transferred $546.04 to Sallie Mae on February 5, 2007. The parties do not address this discrepancy in the amounts, as it is undisputed that MedNorth never made a monthly payment that would amount to 1/36 of the total of Mr. Earls' loans.

has a habit of jotting down notes when he meets with someone. Dr. Blankenship said these were notes regarding a *potential* contract and did not reflect any agreement as of that date. He said that when MedNorth enters into a written contract with a key employee, it is prepared by the clinic's attorney.

Dr. Blankenship said the notation at the top of the document that stated, "8-11-06 Randy/JB MedNorth Contract" was "simply a note about the topic of the discussion that we were having." He said "the major discussion of this meeting was entirely about Randy wanting to get some type of arrangement worked out to get his school loans put into the contract." Regarding the notation that stated, "Goal – no loans at end 3 yrs.," he testified as follows:

> A.    In this meeting Randy wanted me to know specifically the things that he wanted in a contract, and on previous occasions we had discussed contract issues, and when we sat back down to talk about those when he requested, I did not remember those exactly.
>         And on this occasion he was very – he – he was angry at the beginning of the meeting, and to show good faith that I would try not to forget these points that he made, I took notes on the meeting.
> Q.    Okay. And that was the purpose of these notes was to placate him so that he would know that you had listened and taken down what he had said?
> A.    Yes, sir.

Dr. Blankenship explained that the notation "1st discussed/ 8-05" referred to the fact that the parties' first discussed Mr. Earls' employment and the potential for a contract in August of 2005. Dr. Blankenship explained that Mr. Earls brought his student loan documents to the August 2006 meeting, and that "this was the first occasion out of many meetings that I had seen or had been made privy to actual numbers[.]" Dr. Blankenship testified that the notation with the total sum of the loans being divided by three reflected the amount of compensation that Mr. Earls wanted to be included in his yearly benefits package if the parties entered into a contract. He explained:

> He was – he was irate and – and demanding in having this meeting and talking about a possible contract, and he was irate because he stated that when we met it seemed like that I had forgotten the details of what we had discussed before, and so I made notes of the discussion that we had regarding a potential contract that he wanted to have certain things put in that contract.
>         As – as you notice, there is no salary, there is no bonus, and there's no description of what his duties would be, the hours or anything. So Randy at

-6-

this meeting primarily is just trying to hammer into some agreement for somebody to pay his bills for him, and I wrote down the figures that he gave me, and it was a discussion simply regarding issues that could be issues in a future contract.

When asked why both parties signed his notes, Dr. Blankenship explained:

The purpose of that was, again, to have what we discussed at that meeting. There would be no question that those are things that we discussed, and it's just a good-faith gesture to say I'm not going to forget this, and this is something that when we sit down the next time to talk about your contract, you can – you can refer to this.

When asked why he did not keep his notes or even a copy of them, Dr. Blankenship said, "I put down these figures so Randy could have this, because I thought it was a good-faith gesture for him to have it."

Dr. Blankenship testified that after the August 2006 meeting, "[Mr. Earls] decided that he was going to have his school loans involved in his compensation package if he stayed at MedNorth, [and] it was a consistent thing that he would bring up about the loans[.]" Dr. Blankenship said that Mr. Earls subsequently met with him again and explained in some detail the financial difficulties that he was having with child support, medical bills, and his loans. Dr. Blankenship said that Mr. Earls had been extremely stressed at work, so he agreed "to help him through this period of extreme difficulty that he had" by paying some of his monthly student loan payments. However, Dr. Blankenship said he did not agree to pay every student loan payment from that point forward, and that he "certainly was not committing to pay the entirety of his loan." Dr. Blankenship said he was really trying to help Mr. Earls from a personal standpoint, and that it was not really a commitment of MedNorth. Dr. Blankenship said he had an arrangement with his bookkeeper whereby he would make the decision regarding whether to pay Mr. Earls' student loan payment on a month-to-month basis. Dr. Blankenship said he stopped paying Mr. Earls' monthly student loan payments in November of 2006 because he felt that he had already helped Mr. Earls by making the payments that he did, and he felt that Mr. Earls was receiving a fair salary and a fair bonus.

The trial court entered an order incorporating numerous factual findings and conclusions of law, of which the following are noteworthy:

As a result of [the August 2005] meeting, shortly thereafter, Earls became employed with Blankenship. His compensation consisted of a salary and possible bonuses to be determined by Blankenship. Pursuant to conversations

throughout the first year of employment, Earls and Blankenship had another meeting in August, 2006, for the purpose of discussing Earls['] terms of employment. At that meeting, certain notes were made on paper by Blankenship[,] and Blankenship and Earls signed the bottom of that paper. The paper was introduced as Exhibit 1 to the trial. Earls contends that Exhibit 1 are the terms of his contract with Blankenship. Blankenship disputes this contention and asserts that the notes are simply a memorialization of what was discussed in the August 6th meeting that might be included in a future contract if one were entered into between them. . . .

. . . .

A contract can be entirely oral or entirely written, or it can be partly oral and partly in writing. It is not necessary that the parties use any particular words or form of agreement. . . .

. . . .

. . . A contract must be sufficiently explicit so that a court can determine what are the respective obligations of the parties. The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. . . .

. . . .

. . . The most that the Court can say about Exhibit 1 is that if Earls was pursuing a written contract, and if Blankenship was making a written contract, it would have been much clearer than this. . . . The Court is also persuaded that if Earls was seeking to have a certain term inserted into a written agreement concerning his school loans, then it would have contained at a bare minimum a statement that Blankenship was taking over Earls' loans as part of his compensation package and that it would be clear and unambiguous.

The Court has also observed the main witnesses, Earls and Blankenship, and has assessed their credibility and determined that Dr. Blankenship's explanation is more persuasive than that of Earls. Exhibit 1 appears to be exactly what Dr. Blankenship stated, that these were his notes on the subjects discussed at the August, 2006 meeting and the details that Earls had produced at that meeting as to the figures on the school loans which he had not previously furnished to Blankenship. Further, it indicated what goals were important to Earls in regards to the loans. There is nothing in Exhibit 1 that indicates that Blankenship had agreed that the total of the loans balance would be assumed by Blankenship and paid out in any particular length of time.

The writing, Exhibit 1, does not meet the standards required for a written contract. There is nothing on the document that indicates that it is an agreement, an offer, [or] an acceptance. It is obvious from the testimony that there was no meeting of the minds. Exhibit 1 is not sufficiently definite to

constitute a contract. If the Court were called upon to enforce this document as a contract, this Court could not do so. A contract must be sufficiently explicit in order for a court to determine what the obligations of the parties are and to determine whether or not either one has breached the obligation.

(citations omitted). Based on these findings, the trial court dismissed Mr. Earls' complaint. Mr. Earls timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mr. Earls presents the following issues for review, as stated in his brief:

1. Whether the trial court erred in holding that the writing offered by the plaintiff as the contract between the parties was insufficient to be enforced as a written contract;
2. Whether the trial court erred in giving more weight to the testimony of the defendant, Joe D. Blankenship, regarding the existence of a contract between the parties, when the preponderance of the evidence weighs in favor of the plaintiff's proof;
3. Whether the trial court erred in not considering the doctrine of partial performance in determining whether an enforceable contract existed between the parties; and
4. Whether the trial court erred in not considering the doctrine of equitable estoppel in determining whether an enforceable contract existed between the parties.

For the following reasons, we affirm the decision of the chancery court.

## III. STANDARD OF REVIEW

On appeal, we review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)). However, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2009); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of the witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. **Mach. Sales Co., Inc. v.**

*Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* We "will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

## IV.  DISCUSSION

We begin by noting that most of Mr. Earls' arguments on appeal center around the applicability of the statute of frauds. His brief states that "the trial court appears to apply the Statute of Frauds to this dispute insofar as determining whether the writing between the parties constitutes a definite contract." Mr. Earls concedes that the obligation to repay his student loans over the course of three years "does fall within the purview of the Statute of Frauds." However, he contends that the written document produced during the August 2006 meeting satisfies the statute of frauds, and he alternatively contends that exceptions to the statute of frauds would apply, including equitable estoppel and part performance. From our review of the record, however, the trial court did not dismiss Mr. Earls' complaint on the basis of the statute of frauds. The statute of frauds was not mentioned in the trial court's order or in the five pages of findings and conclusions incorporated into the order.

After recognizing that a contract generally can be written, oral, or both, the trial court found that the written document relied upon by Mr. Earls "does not meet the standards required for a written contract." The court also found that it was "obvious from the testimony that there was no meeting of the minds." Thus, we read the trial court's ruling to mean that there was no agreement between the parties, written or oral, regarding the repayment of Mr. Earls' student loans. In other words, this is not a case where the trial court found an otherwise valid agreement that was simply unenforceable in court due to the statute of frauds.[3] On appeal, we will consider the issues Mr. Earls presented regarding whether the writing was sufficient to be enforced as a written contract, and whether the trial court erred in crediting Dr. Blankenship's testimony over that of Mr. Earls. However, we need not consider whether the trial court should have applied an exception to the statute of frauds, such as equitable estoppel or part performance, because we have concluded that the court did

---

[3] The statute of frauds makes certain agreements unenforceable, not void. *Smith v. Smith* No. M2004-00257-COA-R3-CV, 2005 WL 3132370, at *6 n.7 (Tenn. Ct. App. 2005) (citing *Cobble v. Langford*, 230 S.W.2d 194, 196 (Tenn. 1950); *Brakefield v. Anderson*, 10 S.W. 360 (1889)). The statute itself prohibits an "action" from being brought on certain contracts unless there is a sufficient writing. Tenn. Code Ann. § 29-2-101. "It is a rule of formality requiring that actions to enforce certain types of contracts must be based on written evidence of the parties' agreement." *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 611 (Tenn. Ct. App. 1990) (footnote omitted).

not apply the statute of frauds in dismissing this case.[4]

### A.    The "Contract"

Mr. Earls' argues on appeal that the trial court "committed reversible error by holding that the writing offered by the Appellant as the operative agreement between the parties was insufficient to be considered a binding contract." Mr. Earls contends that even though the document is "rudimentary and appears to take the form of 'notes' generated from the meeting," it could be construed by a reasonable person to be an enforceable contract.

It is well established in Tennessee that a contract can be express or implied, written or oral, but a valid and enforceable contract must, among other things, result from a meeting of the minds and must be sufficiently definite to be enforced. ***Admin. Resources, Inc. v. Barrow Group, LLC***, 210 S.W.3d 545, 557 (Tenn. Ct. App. 2006); ***Rice v. NN, Inc. Ball & Roller Div.***, 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006); ***Thompson v. Hensley***, 136 S.W.3d 925, 929 (Tenn. Ct. App. 2003); ***Peoples Bank of Elk Valley v. ConAgra Poultry Co.***, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). "Contracts are to be judged by an objective standard, *i.e.*, what a reasonable onlooker would conclude the parties intended from the words expressed in the instrument." ***Richards v. Taylor***, 926 S.W.2d 569, 571 (Tenn. Ct. App. 1996) (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975); *Cross v. Earls*, 517 S.W.2d 751, 752 (Tenn. 1974); Edward J. Murphy & Richard E. Speidel, *Studies in Contract Law* 92-108 (3rd ed. 1984)). "A contract must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." ***Doe v. HCA Health Servs. of Tenn., Inc.***, 46 S.W.3d 191, 196 (Tenn. 2001) (citation omitted). The terms of the contract are reasonably certain if they provide a basis for determining the existence of a breach of the contract and for giving an appropriate remedy. ***Id.*** (quoting *Restatement (Second) of Contracts*, § 33(2) (1981)). "If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." ***Peoples Bank of Elk Valley***, 832 S.W.2d at 553-54 (citing *Restatement (Second) of Contracts*, § 33 (1981)). An alleged contract may be so lacking in definiteness that it indicates that the mutual assent required to make a contract is lacking. ***Id.*** at 554 (quoting *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)).

We agree with the trial court's conclusion in this case that the document relied upon by Mr. Earls does not constitute a valid and enforceable contract. Like the trial court, we are

---

[4] We also note that from our review of the record, it appears that Mr. Earls did not raise the issue of equitable estoppel before the trial court. Therefore, the argument would have been waived on appeal in any event.

unable to perceive the respective obligations of the parties from the calculations and notations contained in the writing. There is not a single sentence on the entire page, nor is there a basis for determining the existence of a breach of the contract or giving an appropriate remedy. Although there is a calculation dividing the total sum of the loans by three, there is nothing to indicate whether Dr. Blankenship actually agreed to pay this amount or whether this was simply Mr. Earls' demand during contract negotiations.

## B. *The Testimony*

This leads us to Mr. Earls' next issue on appeal, as he argues that the trial court erred in "affording greater weight to the testimony of the Appellee, Dr. Joe D. Blankenship, over the other witnesses and evidence presented at trial." Mr. Earls complains that the trial court failed to give any weight to his ex-wife's testimony, and he contends that Dr. Blankenship's testimony was "riddled with contradictions." The trial judge specifically stated that he had "observed the main witnesses, Earls and Blankenship, and [] assessed their credibility and determined that Dr. Blankenship's explanation is more persuasive than that of Earls." We accord considerable deference to a trial court's findings of credibility and the weight given to oral testimony because the trial judge has the opportunity to hear the in-court testimony and observe the witnesses' demeanor. ***Interstate Mech. Contractors, Inc. v. McIntosh***, 229 S.W.3d 674, 678 (Tenn. 2007) (citing *Tobitt v. Bridgestone/Firestone, Inc.*, 59 S.W.3d 57, 61 (Tenn. 2001); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Workers Comp. Panel 1995)). Furthermore, from our review of the transcript, it appears that Dr. Blankenship's testimony was less contradictory than that of Mr. Earls and his ex-wife. As such, we conclude that the evidence supports the trial court's factual findings, and Mr. Earls' arguments to the contrary are without merit.

## C. *Partial Performance*

As explained above, Mr. Earls' argument regarding partial performance appears to be limited to its application as an exception to the statute of frauds.[5] However, we recognize that partial performance by one party to a bargain may, by the specifics of that performance, cure an indefinite term of the agreement. ***Gurley v. King***, 183 S.W.3d 30, 41 (Tenn. Ct. App. 2005). "Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed." ***Id.*** (citing *Restatement (Second) of Contracts* § 34(2) (1979)). To the extent that Mr. Earls' brief could be construed as raising such an argument, we find it unconvincing. The evidence does not suggest that the parties were performing under the document as if it were a valid contract. Dr. Blankenship's

---

[5] He argues on appeal that "the doctrine of partial performance is applicable to these facts to take the parties' agreement out of the Statute of Frauds because of the partial performance of the Appellee."

minimal payments on Mr. Earl's student loans for a couple of months does not establish that he had entered into an agreement to repay the entirety of Mr. Earls' loans in a three-year period.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court.  Costs of this appeal are taxed to the appellant, Randy Earls, and his surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.



EXHIBIT
1
2-18-09

FILED

Clerk of the Courts
Rec'd By

EXHIBIT
1
6-3-09

001

-14-